**CHARLOTTE SPADARO (SBN 47163)**

rmendez@marcamlaw.com

**Marcam LAW OFFICES**

**200 SOUTH MAIN STREET**

**Suite 300 CORONA, CALIFORNIA 92882**

FILED
CLERK, U.S. DISTRICT COURT

AUG 27 2012
4:19

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

MAY SHAKTAH,        as

                    Plaintiff,

        vs.

CITIMORTGAGE INC.; MCM
CAPITAL HOMEOWNERS TRUST
IX; NEWBURY PLACE REO III,
LLC., a/k/a BSI FFINANCIAL
SERVICES;  JASON LAROCCA;
ANDREA L. HARTLE and DOES
1 THROUGH 10 INCLUSIVE,

                    Defendants,

_____

Case No. CV 12-7367 -DDP (FMOx)

**VERIFIED COMPLAINT FOR**

1. **FRAUD AND DECEIT,
   AND OR NEGLIGENT
   MISREPRESENTATION**
2. **BREACH OF CONTRACT**
3. **DECLARATORY RELIEF**
   [28 U.S.C.§2201,2202]
4. **NEGLIGENCE**
5. **QUASI CONTRACT**
6. Violation of
   [15 U.S.C. §§ 1692 et seq.]
7. **VIOLATION OF**
   [15 U.S.C. § 1641]
8. Violation of CALIFORNIA
   BUSINESS & PROFESSIONS
   [CODE § 17200, et seq.]

**Jury Trial Demanded**

*Complaint For United States District Court - 1*

# TABLE OF CONTENTS

COMPLAINT.................................................................3

**I.** STATEMENT OF FACT.............................................3

**II.** JURISDICTION AND VENUE ...................................4

**III.** THE PARTIES.......................................................5

**IV.** GENERAL FACTUAL ALLEGATIONS.....................7

**V.** INTRODUCTION....................................................8
FRAUD, CONDITIONS OF MIND & CONDITIONS PRECEDENT &
OFFICIAL DOCUMENT OR ACT & TIME AND PLACE...................8

**VI. MERS'S** ROLE AND WHY MERS DID NOT CAUSE THE
ASSIGNMENT TO BE .......................................................15

**VII.** THE INDIVIDUAL DEFENDANTS ROLES IN THE FRAUDULENT
LIEN "THE FABRICATED ASSIGNMENT" THAT CONVEYED NO
INTEREST TO DEFENDANTS...........................................18

**VIII:** PLAINTIFF HAS SUFFERED.................................22

**IX:** FIRST CAUSE OF ACTION-....................................24

**X:** SECOND CAUSE OF ACTION.................................25

**XI:** THIRD CAUSE OF ACTION....................................28

**XII:** FOURTH CAUSE OF ACTION............................ 30

**XIII:** FIFTH CAUSE OF ACTION.................................31

**XIV:** SIXTH CAUSE OF ACTION.................................32

**XV:** SEVENTH CAUSE OF ACTION.............................34

**XVI:** EIGHT CAUSE OF ACTION.................................36

**XVII:** PRAYS FOR RELIEF..........................................39

EXHIBITS PAGE............................................................41

# COMPLAINT

COMES NOW Plaintiff May Shaktah ("Plaintiff or collectively or Mrs. Shaktah") for her Complaint against Defendants, CITIMORTGAGE INC., as the purported original Servicer, "Jason Larocca" an individual perpetrating to be an "Assistant Secretary of MERS" and "Andrea L. Hartle" as the purported Notary and the witness on behalf of the state of Maryland that witnessed the alleged transfer of the beneficial interest from MERS to Defendant MCM Capital Homeowners Advantage Trust IX as the purported beneficiary; and Defendant Newbury Place REO III LLC, a/k/a BSI Financial Services as the purported subsequent beneficiary of the Note and the Mortgage ("the loan") and current holder of the loan; collectively "Defendants" as follows:

## I.   STATEMENT OF FACT

1. The Plaintiff alleges that Defendants and Doe Defendants are third-party strangers to her mortgage loan and have no ownership interest entitling them to collect payments or to declare a default.   By hiding behind the complexities of the Mortgage Lending System, Defendants brazenly attempt to dupe the Plaintiff into believing that they are the parties which have the right to convey the beneficial interest from MERS to Defendant MCM Capital Homeowners Advantage (hereafter, MCM), and then in turn transfer the interest which was conveyed to them fraudulently in the first place to Defendant Newbury Place REO III LLC, a/k/a BSI Financial Services (hereafter; REO III.)   In an attempt to further their fraudulent scheme and to create the air of propriety surrounding their fraudulent efforts, Defendants have resorted to "papering the file" by fabricating and recording of the "Assignment of Deed of Trust" to the alleged Beneficiary MCM , by third party individuals "Jason Larocca " as the purported "Assistant Secretary of MERS" and "Andrea L. Hartle " as the purported Notary Public who has no authority or personal knowledge of the facts to which they attest, and falsely representing to Plaintiff and ***to the court*** that they have the right to take action

against the Plaintiffs' property.   In addition the Defendant MCM has conveyed their alleged interest through an "Assignment of Mortgage/ Security Deed/ Deed of Trust") to another third party Defendant REO III to further complicate and confuse the chain of Assignments which were done fraudulently under the guise of MERS. Not only is Defendants' conduct a criminal violation of California's Mortgage Fraud Statue, Cal. Penal Code Section 532(f)(a)(4)[1], and an affront to long-standing property laws,  but their reliance on fabricated and forged documents undermines the integrity of the judicial system.  In addition; the Defendants have misrepresented themselves in the capacity of multiple parties with the legal right to convey the rights of the Property.

Further; the Defendants have refused to properly respond, communicate and to provide documentations that were requested by the Plaintiff as afforded by Law.

Lastly; the Plaintiff having been left with no other options to cure her damages now files her complaint in Federal Court.  Through her action, The Plaintiff seeks compensation and restitution for her damages and intends to STOP Defendants' fraudulent practices; discover the true Holder in Due Course of her Promissory Note ("Note"), and determine the status of Defendants' claims.

## II. JURISDICTION AND VENUE

2.  This court has jurisdiction over this action pursuant to Title [28 U.S.C. § 1332] which confers original jurisdiction on federal district courts in suits between diverse citizens that involve an amount in controversy in excess of $75,000.00.

3.  This Court also has original jurisdiction over this action pursuant to Title [28 U.S.C §1331, 2201, 2202], [Title 12 U.S.C § 2605; 42 U.S.C. § 1983], Fair Debt Collection Practices Act [15 U.S.C. § 1692-1692p & Title 8 U.S.C. § 802 et seq.] which confer original jurisdiction on federal district courts in suits to address

---

[1]  Cal. Penal Code section 532(f)(a)provides that "a person commits mortgage fraud if, with the intent to defraud, the person does any of the following...(4) files or causes to be filed with the recorder of any county in connection with a mortgage loan transaction any document the person knows to contain a deliberate misstatement, misrepresentation, or omission."

the deprivation of rights secured by federal law[2].  The Defendants and each of them have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, in connection with the transactions, acts, practices and courses of business alleged in this complaint and as such plaintiffs have been aggrieved, or legally harmed by the Defendant's actions.

4.  This Court also has supplemental jurisdiction over the pendant law claims because they form a part of the same case or controversy under Article III of the United States Constitution, pursuant to [ 28 U.S.C. § 1367].

5.  The unlawful conduct, illegal practices, and acts complained of and alleged in the complaint were all committed in Washington County state of Maryland, New York State and involve real property located in the Southern District of California.  Therefore, venue properly lies in the district, pursuant to 28 U.S.C. § 1391(b).

6.  Plaintiff is now, and at all times mentioned herein, individuals residing in the County of Los Angeles.  At all times relevant to this action, Plaintiff has owned real property commonly known as 4407 Alta Tupelo Drive , Calabasas , California 91302 ("Property"), further described as Assessor's Parcel Number 2069-026-049.

### III. THE PARTIES

7.  PLAINTIFF, May Shaktah, at all times herein relevant to the complaint is the owner of real property commonly known as 4407 Alta Tupelo Drive , Calabasas , California 91302 ("Plaintiff".)

---

[2]  The Ninth Circuit instructs that in actions brought under 28 U.S.C. 2201, district courts must first determine whether there is actual controversy within its jurisdiction by analyzing the factors enumerated in *Brillhart v. Excess Ins. Co.* , 316 U.S. 491(1942). The *Brillhart* factors require the Court to (1) avoid needless determination of state law issues; (2) discourage litigants from filing declaratory actions as means of forum shopping; and (3) avoid duplicative litigation. *Brillhart*, 316 U.S. at 495; see also *Schafer V. Citimortgage* No.CV 11-03919, WL 2437267 (C. D .Cal. June 15,2011); As held by the court in *Schafer*, this action does not involve a needless determination of state law issues, does not involve forum shopping, and is not duplicative litigation.

8.  DEFENDANT, CITIMORTGAGE INC. (hereafter; CITI), a New York Corporation; as the purported servicer of the alleged debt ("Debt Collector & and alleged creditor of the alleged debt").

9.  DEFENDANT, MCM CAPITAL HOMEOWNERS ADVANTAGE TRUST IX; a Maryland Corporation; as the purported beneficiary of the loan as of 3-20-2012 to 5-2-2012. ("Wholesale investor of Mortgages") also referred to as the ("Assignee of the debt").

10.  DEFENDANT, Newbury Place REO III, LLC. a/k/a BSI Financial Services ( hereafter; REO III) a Maryland Corporation as the purported current beneficiary of the Note and the Deed of Trust ("the Loan")

11.  DEFENDANT, **"JASON LAROCCA"**, Jason Larocca an individual residing in the United states in the greater New York area ; the purported "Assistant Secretary" of "MERS" as the authorized signatory of the "Assignment of the Deed of Trust".

12.  DEFENDANT, **"ANDREA L. HARTLE "**, Andrea L. Hartle individual residing in Washington County state of Maryland as the alleged Notary that witnessed to the "Assignment of the Deed of Trust.

13.  DOES 1 THROUGH 10 INCLUSIVE, The Plaintiff does not know the true names and nature of Defendants DOES 1 THROUGH 10 INCLUSIVE, and will amend this complaint when their true identities have been ascertained according to proof at trial.

14.  Whenever reference is made in this Complaint to any act of any Defendant(s), that allegation shall mean that such Defendant acted individually and jointly with the other Defendants.

15.  Any allegation about acts of any corporate or other business means that the corporation or other business did the acts alleged through officers, directors, employees, agents and /or representatives while they were acting within the actual or ostensible scope of their authority.

16. At all relevant times, each Defendant committed the acts, caused or directed others to commit the acts, or commit the acts alleged in this Complaint. Additionally, some or all of the defendants acted as the agent of the other Defendants, and all of the Defendants acted within the scope of their agency if acting as an agent of the other.

17. At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this complaint. Knowing or realizing that the other defendants were engaging in or planning to engage in unlawful conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other defendants in the unlawful conduct.

## IV: GENERAL FACTUAL ALLEGATIONS

18. The Plaintiff is informed and believes and re-alleges thereon that Defendants are third party strangers to her alleged debt and mortgage and have no ownership interest entitling them to collect payment or declare a default. The Defendant CITI entered into negotiations with the Plaintiff for a loan Modification without proper disclosures as to their true role in the purported debt. In fact; the Defendant CITI is nothing but a debt collector under the Fair Debt Collection Practice Act (hereafter, FDCPA) and Real Estate Settlement Procedures Act (hereafter, RESPA) as having no ownership in the alleged debt. The Defendants have been engaged in an elaborate business practice to deceive, misrepresent and have schemed to commit fraud and other acts of fraud against the Plaintiff in order to collect on purported debt, Defendants have resorted to "papering the file" by fabricating and filing an "Assignment of Deed of Trust" (Exhibit A, B), employing individuals the Defendants "Jason Larocca" and "Andrea L. Hartle" who have no authority or personal knowledge of the facts to which they attest, and falsely representing to Plaintiffs and the court that they have the right to take the Plaintiffs

real property away.   Not only is Defendant s' conduct a ***criminal violation*** of California's mortgage Fraud Statute, Cal. Penal Code section 532(f)(a)(4), and an affront to long-standing property laws,  but their reliance on fabricated and forged documents undermines the integrity of the judicial system.  Through this action, Plaintiffs seek to stop Defendants fraudulent practices, discover the true holder in due course of the alleged debt evidenced by the Promissory "Note", and determine the status of Defendants' claims.

## V. INTRODUCTION

## FRAUD, CONDITIONS OF MIND & CONDITIONS PRECEDENT & OFFICAL DOCUMENT OR ACT & TIME AND PLACE

19.  During the high times of the mortgage refinancing and mortgage origination era 2002-2007 Countrywide Financial became the biggest lender in the United States. At the same time Wall Street investors looked to feed their insatiable and reckless greed for profit by tapping directly into the American Dream-home ownership.  Mortgage lenders and investment banks aggressively lured the American people into the predatory loans with teaser interest rates and into purchasing homes with inflated appraisals[3] and under the promise that the booming real estate market would continue to boom.  Wall Street took the soon to be toxic loans and bundled them into "Mortgage Backed Securities" through a process known as "Securitization".  These "Securities" were then sold to investors

---

[3] (Reuters) - A former home appraiser will receive $14.5 million as part of a whistleblower lawsuit that accused subprime lender Countrywide Financial of inflating appraisals on government-insured loans, his attorneys said Tuesday. Kyle Lagow's lawsuit sparked an investigation that culminated in a $1 billion settlement announced in February between Bank of America Corp (NYS:BAC - News) and the U.S. Justice Department over allegations of mortgage fraud at Countrywide, his attorneys said in a news release. Bank of America bought Countrywide in 2008.Lagow's suit was one of five whistleblower complaints that were folded into the $25 billion national mortgage settlement that state and federal officials reached with Bank of America and four other lenders this year. His suit was unsealed in February, but the amount of his settlement had not been disclosed. http://finance.yahoo.com/news/bank-america-whistleblower-receives-14-232819912

1   in the form of certificates, whereby the investors became the "Certificateholders"

2   of the securities that were to be fed by the toxic loans.

3       20. The Plaintiff is informed and alleges that none of the Defendants in this

4   complaint could have or had the legal right to convey any Assignments.

5       21. In fact; the Note and the Deed of Trust were placed into a common law

6   trust before the closing date of the Trust on November 30, 2005; the name of the

7   common law trust was/is Bear Stearns Asset Backed Securities 2005-AC9.(See

8   Exhibit C.)

9       22. An essential aspect of the mortgage securitization process is that the

10  Trust must obtain and maintain good title to the mortgage loans comprising the

11  pool for that certificate offering. This is necessary in order for the Trustee of the

12  purportedly Securitized Trust to be legally entitled to enforce the mortgage loans in

13  the case of default.   In addition to other required documentation to complete the

14  Collateral File of any given loan, two documents relating to each mortgage loan

15  must be validly transferred to the Trust as part of the securitization process - the

16  Promissory Note and the security instrument (Deed of Trust or Mortgage Note).

17  In this case, on information and belief, both documents were validly transferred

18  within the required timelines as stipulated by the pooling and servicing agreement

19  and placed into the Trust.

20      23. Here, Plaintiff alleges that a "true sale" took place; Defendant CITI or

21  any other Doe Defendants did not acquire any legal, equitable, and pecuniary

22  interest in the Plaintiffs' Note and Mortgage.  As a result, thereof, Defendants and

23  other Doe Defendants which purported to be the Plaintiffs' creditor, actually had

24  no secured or unsecured right, title, or interest in the Plaintiffs' Note and

25  Mortgage, and had no right to collect mortgage payments, demand mortgage

26  payments, or report derogatorily items against the Plaintiffs' credit, or to default

27  the plaintiff.

28

24. The Plaintiff further alleges that, on information and belief, the "Bear Stearns Asset Backed Securities 2005-AC9" ("hereinafter the 2005-AC9 Trust") that owns the Plaintiffs' Note and Mortgage is still the only real beneficiary of the purported debt.

25. Despite the procedural requirements and the rules governing the proper accounting procedures Governing the Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities "FAS-140" and Federal and State laws overseeing the compliance of such transactions, the Defendants attempt to take advantage of the complex structured financial system to defraud the Plaintiff as they have done with millions of other homeowners from the inception of the meltdown. Plaintiff anticipates that the Defendants and their counsel will seek a Court-sanctioned bailout by submitting a blatantly fabricated "Assignment" or a copy of the Deed of Trust and the Note that does not reflect any information or proof that the Defendants are the true assignees or beneficiaries via a Request for Judicial Notice, thereby committing fraud on the court, and attempting to further mislead Plaintiffs that the Defendants MCM, and REO III are actual creditors, and are entitled to enforce their alleged obligation.

26. The Plaintiff does not dispute that she owes an amount on her alleged Mortgage obligation[4]. Rather, Plaintiff disputes the Defendants claims as to having the legal right and the ownership interest as to the purported Debt and Mortgage "the Loan", and seeks the Court's assistance in determining who the holder in due course is of his alleged Note and alleged Deed of Trust, and specifically what rights, if any, the Defendants have to claim a secured or unsecured interest in the Plaintiffs' alleged Note or alleged Mortgage "the Loan".

---

[4] However, simply because plaintiffs do not dispute this fact, the court should not condone Bank of America and Recontrust's fraudulent behavior and predatory mortgage collection practices and allow it to collect on money it was not owed. Simply put, the court should not allow the defendants to trample over 200 years of well-settled property laws just because the "owes somebody money."

27.   The Attorney and the Plaintiff's information and belief is based on (1) Detailed analysis of the Property's title records (2) The analysis of the Mortgage documents on record and with escrow (3)  a securitization audit conducted by a third party (4) The Plaintiff  has also conducted detailed study of the ongoing events with respect to "Legacy Assets", "Legacy Securitization Program", "Legacy Loan Programs"  and other offerings by the respective governing agencies to entities such as the Defendants (The Collector of the alleged debt) (5) an audit of the filings with the Securities and Exchange Commission ("SEC"), including the trust's 424(b)(5)Prospectus and the Pooling and Servicing Agreement ("PSA").

28.   Plaintiff alleges that at no time has there been an Assignment from the 2005-AC9 Trust to any of the Defendants that would give the any of Defendants the legal right to imply any ownership of the purported debt.

29.   On or about August 17, 2005, the Plaintiff executed a Note and Mortgage in favor of Metrocities Mortgage LLC. a mortgage banker that conducted financing of residential properties, ("hereafter "Metrocities") obtaining a loan on the property located at 4407 Alta Tupelo Dr, Calabasas,  Ca 91302; MERS was named on the Deed of Trust as the purported "*nominee*" and "*beneficiary*" of the Deed of Trust.

30.   The Plaintiff is informed and alleges that Metrocities sold, transferred, assigned or granted their Note or Mortgage to the sponsor, depositor; the Defendants are merely third - party stranger to the alleged debt "the Loan" transaction.   Furthermore, Plaintiff alleges that none of the Defendants or Doe Defendants can demonstrate or document that Plaintiffs' Note was ever endorsed, assigned or/and transferred to MCM or REO III , prior to the *closing* and *termination* of the alleged Trust.   In fact, Plaintiff has requested multiple times for the Defendant CITI to verify and validate his debt.   Although this information should be readily available to any mortgage servicer, CITI has failed to provide

1   any evidence to verify the owner and amount of the Plaintiffs' Mortgage or

2   validate the claim to the Plaintiffs' debt obligation.

3       31. The Plaintiff alleges that the Defendants as the alleged beneficiaries of

4   the Plaintiffs' Note and Mortgage cannot prove that they were a party to the initial

5   securitization process and fail to adhere to section **2.01** of the PSA, which requires

6   that Plaintiffs' Note and Mortgage be properly endorsed, transferred, accepted, and

7   deposited into the Securitized Trust (or its custodian) on or before the "***closing***

8   ***date***" indicated on the Prospectus ; the "***closing date***" is the date by which all the

9   Notes and Mortgages must be transferred into the "2005-AC9 Trust ". The failure

10   to do so results in the Note and Mortgage being part the "2005-AC9 Trust" and not

11   associated with any of the Defendants or MERS.

12       32. On or about March 20, 2012, "Jason Larocca ", purportedly the alleged

13   "Assistant Secretary" for MERS, allegedly executed a document purporting to be

14   an "Corporation Assignment of the Deed of Trust" (" hereafter, Assignment"), in

15   which he intentionally misrepresented to the Plaintiff in writing that MCM has

16   acquired the interest in the Plaintiffs' Note and Mortgage, and that MERS has

17   endorsed, transferred, and negotiated the Plaintiffs' Note to Defendant "***For***

18   ***Valuable Consideration***".  In fact, no such transfer of interest took place, a fact

19   that "Jason Larocca", MCM were/ are aware of (See Exhibit A), attached hereto is

20   a true and correct copy of the Assignment, executed on March 20, 2012. **Plaintiff**

21   **specifically disputes the contents and the authenticity of the document**.

22       33. On or about March 20, 2012, "Andrea L. Hartle",  purportedly the

23   alleged "Notary Public" witnessed the purported "Assistant Secretary" "Jason

24   Larocca " executing the alleged "Assignment" from MERS to "MCM".  In fact,

25   no such transfer of interest took place, a fact that "Andrea L. Hartle" , "Jason

26   Larocca", MCM were/are aware of (See Exhibit A), attached hereto is a true and

27   correct copy of the Assignment, executed on March 20,2012.  **Plaintiff**

28   **specifically disputes the contents and the authenticity of the document.**

34. The Plaintiff alleges that the "Assignment" that was executed after the closing date of the trust; The dubious "*Assignment*" raises numerous red flags and further demonstrates that the Plaintiffs' Note and Mortgage were not Assigned to the Defendants by the closing date, and that the "Assignment" were fabricated in attempt to "paper over" the fatal Assignment defects by individuals that commit these acts as a daily regimen. The acts perpetrated by the individuals acting as the "Assistant Secretary of MERS" and the "Public Notary" as the purported witness of the state was caused by the Defendants as part of a scheme to defraud the United States Treasury and the Plaintiff by foreclosing and collecting TARP funds as an assigned agent of the Department of Treasury pursuant to 12 U.S.C. § 5211(c) (2) (3).

35. The failure to assign the Plaintiffs' Note to the Defendants before the closing date is a violation of the PSA and New York trust Law. Consequently, the Defendants cannot claim any legal or equitable right, title, or interest in the Plaintiffs' Note and Mortgage.

36. The Plaintiff does not allege or assert that they are beneficiaries or parties to the purported debt. Rather, Plaintiff alleges that the failure to properly Assign her Note and the subsequent fraudulent "Assignment" makes it impossible for any of the Defendants to claim, allege or assert that they were assigned, transferred or granted Plaintiffs' Note or Mortgage, or any interest therein, in any manner whatsoever. Plaintiff also alleges that the failure to properly Assign her Note and mortgage has resulted in an unperfected lien that Defendants cannot enforce in any manner whatsoever[5].

[5] These allegations are identical to those brought by the Nevada Attorney General against Bank of America, BAC Home Loan Servicing, and RECONTRUST, in which Attorney General Catherine Cortez Masto alleges that these entities engaged in unlawful and deceptive practices by misrepresenting to homeowners that they had the authority to foreclose despite the fact that there were fatal deficiencies in transfers to the securitization Trusts, State of *Nevada vs. Bank of America et al.*, No.3:11-ev-00135-RJD,(C.D. New August 30, 2011). The AG concludes that, "[t]hese are mere technicalities. The PSA's spelled out specific procedures in order to ensure a proper transfer, protect the Trusts as the holders in due course, and avoid subjecting the Trusts to

37. The Plaintiff in good faith relied on CITI misrepresentation and has been damaged in the following ways: (1) the Plaintiff in good faith relied on the representations made by CITI employees and team members and became delinquent on her mortgage in order to be assisted for a Modification as told by the customer representative and have lost multiple credit lines and have incurred delinquencies on their credit report (2) the Plaintiff in good faith relied on Defendant CITI representation as being the purported creditor, owner, servicer and entered into a contract for loan Modification that was soon after breached by the Defendant in an attempt to redirect funds into accounts that were not part of the alleged loan servicing system (3) the Plaintiff in good faith relied on the representation of the Defendant CITI and entered into the process for a Loan Modification that was intentionally denied so that the Defendant could illegally foreclose on the Plaintiffs Property in order to collect TARP funds pursuant and in violation of [12 U.S.C. § 5211(e)] in order to be unjustly enriched. (4) multiple parties may seek to enforce their alleged debt obligation against them; (5) the title to the Plaintiffs' home has been clouded and rendered unmarketable (unless more fraudulent actions are taken to show the foreclosure proceedings as proper and legal), as any would be buyer of the Plaintiffs' property will find themselves in legal limbo, unable to know with any certainty whether they can safely buy the Plaintiffs property or get title insurance;(6) the Plaintiff has paid the wrong party and other payments for an undetermined amount of time and overpaid in interest that was over calculated; (7) they are unable to determine whether they sent their monthly mortgage payments to the right party; (8) their credit worthiness has been destroyed due to the Defendants misreporting of alleged debts being delinquent without proper standing (9) they have expended significant funds to cover the cost

taxation. In addition, borrowers need to know the actual holders of their mortgages so that, for example, they can investigate and assert available defenses in foreclosures, including that the agent of the trustee lacks authority or standing under the Note."*Id* at ¶ 146.

associated with processes involved, credit lines closed and legal fees and other fees paid to the wrong parties.

38. In addition to seeking compensatory, consequential, punitive, and other damages, Plaintiff seeks Declaratory Relief as to whether the Deed of Trust (Mortgage) secures any, obligation of the Plaintiffs' in favor of Defendants , such that any of them can collect Plaintiffs' mortgage payments, demand payment or engage in debt collection activities.

## VI: MERS's ROLE AND WHY MERS DID NOT CAUSE THE ASSIGNMENT TO BE RECORDED

39. Mortgage Electronic Registration Systems, Inc. ("MERS") is a private corporation that administrates the MERS system, a national electronic registry system that purports to track the transfer of ownership interests and servicing rights in mortgage loans, including the Plaintiffs' alleged "Loan". In 1993, the MERS system was created by several large lenders; eventually other mortgage banking entities became members. Members subscribe to the MERS system and pay an annual fee for the electronic processing and tracking of ownership and transfers of mortgages. Members contractually agree to appoint MERS as their common agent on all mortgages they register in the MERS system. In essence , MERS privatized the mortgage recording system, creating a situation where in a borrower can no longer go to the office of the Recorder's office and determine who her lender actually is at any given point in time.

40. MERS is listed as grantee in the official records at the county register of Deeds offices. The lenders were supposed to retain the interest in the promissory Notes, as well as the servicing rights to the mortgages, **not MERS**.

41. The Plaintiffs allege that MERS did not affect an Assignment, transfer, negotiation, or sale of his Note and Mortgage to any Defendant or Doe Defendant.

42. The operative document defining MERS and its rights and functions is the Deed of Trust ("Deed of Trust or "Trust Deed"). The Deed of Trust conveys a

1   security interest and power of sale in the real property "real estate" to the lender

2   only, **not MERS**[6].

3      43.  The Plaintiff is informed that MERS is merely an electronic registration

4   system and not a true beneficiary, and did not Grant, Assign, or Transfer any true

5   or pecuniary beneficial interest in the Plaintiffs' Note and Mortgage.  Contrary to

6   the recitations contained in the fraudulent "Assignment of the Deed of Trust"

7   purportedly executed on March 20, 2012.  The Plaintiff alleges the following to be

8   facts (1) MERS did not receive any "***Value***" or consideration for the Plaintiffs'

9   Note and Mortgage, (2) MERS did not "Grant, Assign, or Transfer" any interest in

10  the Plaintiffs' Note and Mortgage; and (3) "Jason Larocca" and the purported

11  signatory of the purported "Assignment of Deed of Trust" (Exhibit A), was/is not

12  an "Assistant Secretary" for MERS at any time and lacked the requisite corporate

13  and legal authority to effect an actual "Assignment" of the Plaintiffs' Note and

14  Mortgage (MERS never had any legal, equitable, or pecuniary interest in the

15  Plaintiffs' Note and Mortgage).

16     44. .  The Plaintiff is informed that MERS's own membership rules directly

17  prohibit the company from ever claiming ownership of any mortgages or

18  negotiable instruments, including the mortgage for the plaintiff[7] (See Exhibit D)

19  (See items 2,3,6 in the Terms and Conditions).   In fact, in September 2009

20  deposition, former President of MERS R.K. Arnold stated for the record that

21  MERS does not have a beneficial interest in any mortgage, that it does not loan

22  money,  and that it does not suffer a default if a borrower fails to repay a mortgage

23

24  [6] This Security Instrument secures to the Lender :(i) the repayment of the Loan, and all
renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's

25  covenants and agreements under this Security Instrument and the Note. For this purpose,
Borrower irrevocably grants, conveys and warrants to Trustee, in trust, with power of sale, the

26  following described property located in the County of Riverside: [legal description of the
property] Deed of Trust ¶R.

27  [7] A successor-in-interest to the beneficial interest in the trust Deed may choose to engage MERS
as its agent by execution of a subsequent agreement, but MERS and its members cannot force

28  MERS upon all future purchasers simply by claiming such authority in the original deed of trust.

loan[8].  Therefore, the evidence and testimony of the former President of MERS and the Plaintiffs' own history with MERS prove and show without a doubt that MERS does not own the Plaintiffs' Note and Mortgage, 'and did not "Grant, Assign, or Transfer" any interest therein to "MCM" or any other Doe defendants at any time.  Furthermore;  the alleged Assignment that has been executed on March 20 , 2012 by Defendants  *__Jason Larocca __* and  *__Andrea L. Hartle__* and with Los Angeles County Recorders' Office could have never actually happened before or there-after.

45.   The Plaintiff is informed and alleges that the purported "Assignment" of the Plaintiffs' Note and Mortgage to "MCM" and the subsequent "Assignment" from MCM to REO III are fraudulent lien claim and in direct contravention of the laws and customs of California[9].  In fact; the purported "Assignment(s)" were caused to be recorded by the Defendants as part of Defendants desire to get paid by other Doe Defendants; the Defendant are individuals employed by Doe Defendants as subcontractors acting as agents to fabricate and record the "Assignment of Deed of Trust" and has been the driving force behind the illegal and fraudulent collection of the alleged debt.

46. In addition;  the purported beneficiary MERS according to the instrument number 051997819 has declared this loan "*inactive*" which could only mean two possible outcomes, either the loan has been closed and /or paid off, or that MERS was assigned out as the beneficiary. If MERS was in fact substituted

---

[8]  See video deposition of R.K. Arnold, *Henderson v. MERSCORP, Inc,* Civil Action No.CV-08-900805 (Ala.Cir.Sept.25 2009) available at http://www.stopforeclosurefraud.com/2010/05/29/full- deposition-of-mortgage-electronic-registration-systems-mers-president-ceo-r-k-arnold-merscorp/).

[9]  Whatever 'necessary to comply with law or custom' means, and there is no evidence in the record to explain it. It should not mean that *U.S. bank  or MERS'* can contract away her obligations to comply with foreclosure statues." *In re Salazar*.448 B.R.814.823 (finding that MERS system is not an alternative to statutory foreclosure laws. which "must be respected." and affirming that "if [t]her court ...joins the courts on other states that have rejected MERS' offer of an alternative to the public recording system.") *Id. at 824*

1   out for another beneficiary, no such assignment has been recorded to provide the

2   needed evidence that this indeed took place.

3        47.   Therefore, based on the foregoing, MERS did not, *in fact*, authorize the

4   assignment of any interest held by MERS to Defendants "Jason Larocca" and

5   "Andrea L. Hartle" or any other Doe Defendants such that any Doe Defendants can

6   demand mortgage payments or report the Plaintiffs' payments as delinquent or

7   attempt to foreclose on the Property.

8   **VII:  THE INDIVIDUAL DEFENDANTS ROLES IN THE FRAUDULENT**

9   **LIEN "THE FABRICATED ASSIGNMENT" THAT CONVEYED NO**

10  **INTEREST TO MCM CAPITAL HOMEOWNERS TRUST IX**

11       48.   On March 20, 2012, Defendants "Jason Larocca" and "Andrea L.

12  Hartle" and Doe Defendants caused the "Assignment of Deed of Trust" to be

13  recorded with Los Angeles County Recorders' Office. The "Assignment" alleged

14  "*FOR VALUE RECEIVED*" MERS granted, Assigned, and Transferred to

15  "MCM" all beneficial interest in the Deed of Trust "Mortgage".

16       48.   The "Assignment of Deed of Trust" was /were purportedly signed by

17  "Jason Larocca " as alleged "Assistant Secretary" of MERS and witnessed on

18  behalf of the state of Maryland by the Notary Public "Andrea L. Hartle".  The

19  Plaintiff alleges that no such transfers ever occurred and that "**Jason Larocca**" has

20  never been an employee or an "Assistant Secretary" of MERS (See Exhibit E.)

21  The Plaintiff also alleges that "**Andrea L. Hartle**" never witnessed the alleged

22  "Assistant Secretary" "**Jason Larocca** " execute the dubious "Assignment" as a

23  witness for the state per her sworn statement as stamped and recorded with the Los

24  Angeles County Recorders' office.

25       49.   The Plaintiff is informed and alleges that "Jason Larocca"&"Andrea L.

26  Hartle" are individuals who simply sign hundreds of property record documents

27  without any legal or corporate authority whatsoever under the direction of other

28

1  Doe Defendants with the full knowledge that they are committing illegal and

2  unlawful acts .

3      50. In fact, the alleged Assignment was fraudulently executed without

4  MERS's authorization or knowledge.

5      51. The alleged "Assistant Secretary" **"Jason Larocca"** for MERS was

6  never, in any manner whatsoever, appointed as the "Assistant Secretary" by the

7  Board of Directors of MERS, as required by MERS's corporate by-laws and

8  adopted corporate resolution by the Board of Directors of MERS.  For that reason,

9  the individual acting as the alleged "Assistant Secretary of MERS" never had, nor

10 has, any Corporate or Legal authority from MERS, or the lender's successors and

11 assigns, to execute the purported "Assignment"[10]. This was an intentional act by

12 the Defendant "Jason Larocca" and other Doe Defendants done knowingly with

13 specific intent that the consequences of their actions be brought to fruition, which

14 they have as evidenced by the instant debt collection activities.

15     52. The "*Assignment(s) of the Deed of Trust*" are fraudulent lien claim, and

16 the execution, filing, and recordation of the documents was created for the purpose

17 of facilitating and aiding and abetting the illegal, deceptive, and unlawful

18 collection of the Plaintiffs' mortgage payments, as well as engaging in other

19 wrongful debt collection activities.

20     53. The Plaintiff alleges that any amounts allegedly owed under the Note is

21 subject to equitable offset by the actual, consequential, special, and punitive

22 damages owed to the Plaintiff from Defendants, which amount is currently

23

24

25 [10] The instant case is analogous to *Kingman holdings, LLC v.Citimortgage, Inc. and Mortgage
   *Electronic Registration Systems, Inc.* WL 1883829 9 E.D Tex. 2011) ("Kingman"), where the

26 court denied a motion to dismiss with similar causes of action as those that are pled here on the
   basis that the plaintiff had adequately challenged the signatory's alleged title as 'Vice President'

27 of MERS. The Kingman court held that the <u>plaintiff had adequately pled that the assignments</u>
   <u>executed by Nate Blackstun as "Vice President" on behalf of MERS, was void because</u>

28 <u>Blackstun was not actually appointed by MERS to be its Vice President.</u>

1   unknown, but will be determined upon conducting discovery.  Plaintiff believes

2   that the amount will be in excess of the amount of her alleged obligation.

3       54.  The Defendants' and other Doe Defendants attempts to "Assign" or

4   transfer a Deed of Trust by itself, does not allow enforcement of Plaintiffs' Note

5   and Mortgage. As alleged in the complaint herein, Plaintiffs' Note and Mortgage

6   was not properly negotiated, endorsed, and transferred to MCM or REO III who

7   seek to collect mortgage payments and engage in other unlawful collection

8   practices.

9       55.  California Commercial Code section 3301 limits a negotiable

10  instrument's enforcement to the following:

11      "Person entitled to enforce" an instrument means

12      (a) The holder of the instrument,

13      (b) A nonholder in possession of the instrument who has the rights of a

14      holder, or

15      (c) A person not in possession of the instrument who is entitled to enforce

16      the instruments pursuant to Section 3309 or subdivision

17      (d) Of Section 3418.  A person may be a person entitled to enforce the

18      instrument even though the person is not the owner of the instrument or is in

19      wrongful possession of the instrument.

20      56.  On information and belief, none of the Defendants or Doe Defendants

21  were/are present holders in due course of the Plaintiffs' Note such that they can

22  enforce Plaintiffs' obligation and demand mortgage payments.

23      57.  On information and belief, Defendant's or Doe Defendants were not,

24  and are not, a nonholder in possession of the Plaintiffs' Note who has the rights of

25  a holder.

26      58.  If there is a holder due in course of Plaintiffs' Note at issue, pursuant to

27  *California Commercial Code section 3301, et seq,*  it is the entity that can establish

28

a pecuniary, legal, and equitable interest in the property, and provide an unbroken chain of title to Plaintiffs' Note and Mortgage.

59. On information and belief, none of the Defendant's or Doe Defendants were/are entitled to enforce the Plaintiff's Note pursuant to § 3309 or subdivision (d) of § 3418

60. The Plaintiff alleges that, prior to the Assignment, none of the Defendants had, nor presently have, secured or unsecured legal, equitable, or pecuniary interest in Plaintiffs' Note and/or Deed of Trust as required under California Law-irrespective of who is actually in physical possession of Plaintiffs' Note.

61. The Plaintiff alleges that, on information and belief, "Jason Larocca" and "Andrea L. Hartle" and other Doe Defendants or its agents are fraudulently enforcing an alleged debt obligation in which they have no pecuniary, equitable or legal interest.

62. Furthermore; the only document that governs the Assignment of the Note and the Mortgage is the Deed of Trust, and as stipulated in **provision 24** of the Deed that governs the Substitution of Trustee.  It provides in relevant part:

["**Lender**, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument **executed and acknowledged by Lender**.....The procedure for substitution of trustee shall govern to the exclusion of all other provision for substitution."]

63. The Plaintiff alleges that the Defendant "**Jason Larocca**" recorded "Assignment of Deed of Trust" claiming that as the agent of the present beneficiary, MERS desired to grant, assign, and transfer all beneficial interest to Defendant "MCM", for *Value received*, the Plaintiff re-alleges that no such "Assignment" occurred.

64. The Plaintiff is informed and re-alleges that "**Jason Larocca**" is an individual who simply signs hundreds of documents without any legal or corporate authority whatsoever.

65. "**Jason Larocca**" is not an "Assistant Secretary" of MERS.

66. "**Jason Larocca**" is/was never, in any manner whatsoever, appointed as a "Assistant Secretary" by MERS, thus giving him no Corporate or Legal authority from MERS, or the lender's successors and assigns, to execute the purported "Corporation Assignment of Deed of Trust", This was an intentional act undertaken by the individual Defendants "**Jason Larocca**" and "**Andrea L. Hartle**" and other Doe Defendants done knowingly with the specific intent that the consequences of their actions be brought to fruition, which they have as evidenced by the instant debt collection activities.

67. The "Assignment of Deed of Trust" is a fraudulent document, and the execution, filing, and recordation of the document was created for the purpose of facilitating and aiding and abetting the illegal, deceptive, and unlawful collection and attempts to collect on Plaintiffs' alleged debt obligations.

## VIII:  PLAINTIFF HAS SUFFERED, AND CONTINUES TO SUFFER SIGNIFICANT MONETERY, LEGAL, AND EQUITABLE DAMAGES

68. The conduct described above by Defendant "**Jason Larocca**" and other Defendants and Doe Defendants was/is malicious because Defendants knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and Mortgage.  However, despite such knowledge, Defendants continued and continue to misrepresent themselves as employees or authorized agents of MERS conveying and transferring Property rights of hundreds of homeowners to entities which have no rights or interest in the Property.

69.   As a direct and proximate result of the actions of the Defendants set forth above, the title to the Plaintiffs' Property has been slandered, clouded, and its salability has been rendered unmarketable.

70.   As a direct and proximate result of the actions of the Defendants set forth above, Plaintiff does not know who the current beneficiary of her alleged Note and Mortgage actually is, such that she is now subject to "*double financial jeopardy*" as evidenced by the Defendants MCM and REO III attempts to foreclose on the Property.

71.   As a direct and proximate result of the actions of the Defendants set forth above, *multiple* parties can attempt to enforce Plaintiffs' alleged debt obligations.

72.   The conduct of "**Jason Larocca**" and one or more of the Doe Defendants has led to imminent loss of Plaintiffs' real property and pecuniary damages.  The pecuniary damages include, but are not limited to, the cost of over calculation and overpayment of interest and principle, the cost of repairing Plaintiffs' credit, the reduction and/or elimination of Plaintiffs' credit limits, the cost associated with removing the cloud from her property title and attorney's fees, and other damages in an amount to be proven at trial.

73.   The conduct of "**Jason Larocca**" and  "**Andrea L. Hartle** " and one or more of the Doe Defendants' conduct was malicious because Defendants did not know the identity of the current and true beneficiary of Plaintiff's Note and Deed of Trust, yet they intentionally and fraudulently covered up the defect by wrongfully recording a fraudulent "Assignment of Deed of Trust"  which would be enable them to *illegally and fraudulently* collect on Plaintiffs' debt, and which in essence has rendered the title the *Property* unmarketable.

74.   The title to Plaintiffs' *Property* has been rendered unmarketable and useable because of the possibility of multiple claims made against Plaintiffs' alleged debt obligation and the underlying security (the subject property).  If the

"Assignment of the Deed of Trust" is not cancelled and set aside, Plaintiff will be incurably prejudiced.   Plaintiff will be denied the opportunity to identify and negotiate with the ***true creditor*** and exercise her right and due process to verify and validate her alleged debt.

75.  The Plaintiff has a genuine dispute against Defendants and the transfer of the alleged claims to the beneficial interest and standing in the alleged debt and mortgage "the loan".

## IX: FIRST CAUSE OF ACTION
## FRAUD AND DECEIT, AND OR NEGLIGENT
## MISREPRESENTATION
### [Against All Defendants]

The Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

76.   The Defendants colluded in the facilitation and procurement of the execution and recording of the Assignment, which were fraudulent in nature and injurious to Plaintiffs.

77.  Defendants and Doe Defendants at various times throughout the execution and recording of the Assignment of Deed of Trust knowingly misrepresented, inter alia, the following:

a. Their capacity as authorized employees or agents

b. The transfer of beneficial interest from MERS to MCM

c. The Transfer of beneficial interest from MCM to Newbury Place REO III, LLC.

d. The true identity of the entity with the pecuniary interest in the alleged Note and Deed of Trust.

e. Their role as subcontractors which illegally conveyed the property rights of the Property

1    f. Defendants actions in misleading the Plaintiff in order to be enriched

2    through the fruit of their actions.

3    78.  Defendants knowingly or negligently defrauded Plaintiffs, causing them

4    to be misleading about the true identity of the beneficiary of the purported debt

5    which Defendants knew Plaintiff was unlikely to ever be able to identify.

6    79.  Defendants knowingly misrepresented themselves and their capacity to

7    the Plaintiff without any concern of the consequences that their actions may result;

8    in this instant case the Plaintiff has no knowledge of the true identity of the

9    beneficiary of the Note and the Deed of Trust; and as such has not been able to

10   negotiate with the party holding the interest in the loan.

11   80.  As a result of Defendants' misrepresentations, Plaintiffs have been

12   damaged in an amount to be proven at trial.

13   81.  Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are

14   entitled to recover their reasonable attorney's fees, costs, and expenses incurred in

15   bringing this action.

16   ## X: SECOND CAUSE OF ACTION

17   ## BREACH OF CONTRACT

18   ### [Against Defendant CITIMORTGAGE INC.]

19   82.  The Plaintiff hereby incorporates by reference each and every one of

20   the preceding paragraphs as if the same were fully set forth herein.

21   83.  The Plaintiff is informed and alleges that Defendant CITI has Breached

22   the terms of the Loan Modification process through inducement, misrepresentation,

23   and unjust enrichment; the Defendant induced the Plaintiff to become late in order

24   to get assistance with the Modification Process; and continued to mislead the

25   Plaintiff by representing to the Plaintiff that Defendant was in fact working in good

26   faith to process the Plaintiff for a Modification.  The Defendants collected and

27   requested information from the borrower on the premise that they are the party

28   with the legal rights to extend and offer an amended Modification clause to the

1  original Note; the Defendants reviewed financial and personal information of the

2  Plaintiff in order to make their decision without taking into account the net present

3  value calculations as required by the Department of Treasury pursuant to 12 U.S.C.

4  § 5219(a) (1) under section 1715z-23.

5      84.   The Plaintiff was never offered a Loan Modification Program pursuant

6  to the Foreclosure Mitigation stipulation within 12 U.S.C. § 5219.

7      85.   The Defendant misrepresented themselves as the creditor of the debt

8  and through their representation induced the Plaintiff into a due diligence process

9  which did not meet the required perimeters of the Department of Treasury

10  (hereafter, DOT) pursuant to [12 U.S.C.§ 5219] ;  the Plaintiff alleges that the

11  Defendant did not follow the protocol set forth by the DOT as the Defendants true

12  intentions were to collect any amounts possible and to move forward with the

13  disposition of the Property as means sanctioned by the DOT to qualify for the

14  TARP Funds .

15      86.   The Plaintiff is informed an alleges that CITI business practice of

16  misleading and foreclosing on the Property provides the Defendant with a much

17  greater return in a shorter amount of time;  as such Defendant CITI has a greater

18  incentive not to fulfill Loan Modification processes and by intentionally not

19  adhering to the requirements as set forth by the DOT.  The Defendant also through

20  this practice creates the perception of a compliant process for which they will

21  qualify for the collection of TARP funds "vouchers" from the DOT in the form of

22  either Treasury Bills or Receivable Notes from the Federal Reserve as shown in

23  their balance sheet.

24      87.  The Plaintiff does not allege that the operation of the DOT or the Board

25  of Federal Reserve (hereafter, the Board) are incorrect; as a matter of fact the

26  Plaintiff is informed that the Board themselves have conducted an in depth

27  investigation which confirms the Plaintiffs' allegations of misconduct by the hired

28

1   agents (Collectors, and the top Servicers of Securities) (See Exhibit E, here in

2   incorporated is a true copy of the findings of the Board).

3       88.   The Plaintiff is informed and alleges that the Defendants practices in

4   the approval process of Loan Modification is a strategy to become unjustly

5   enriched by collection of the most amount of monies possible from the Plaintiff

6   and others in similar circumstances before the inevitable default of the agreement

7   and the Defendants' move to take disposition of the Property.

8       89.   The Plaintiff alleges that the Defendant CITI has violated their agreed

9   covenants within the Loan Modification process; the Defendant has attempted to

10   collect the funds with the intention to foreclosure on the Plaintiff in a process

11   which would allow for TARP funds to be paid to Defendant CITI as an agent of

12   collection and to become unjustly enriched.

13       90.   Furthermore, the conduct of CITI, and their agents, and one or more of

14   the Doe Defendants, and each them, as herein described, has been malicious and

15   intentional in order to take disposition of the Plaintiffs' Property.  The Defendant

16   CITI and one or more Doe Defendants did not follow the exact procedures as set

17   forth by the DOT in an effort to enrich themselves without consideration of laws

18   and legislations that have given them their unchecked powers; and as such the

19   Plaintiff has been damaged in the amount of funds paid to Defendant CITI and

20   other damages due to their disregard for compliance; therefore the Plaintiff is

21   entitled to punitive damages in an amount appropriate to punish Defendants and to

22   deter others from engaging in similar conduct.

23       The Plaintiff also asks the court to issue orders to stop the Defendants and

24   Doe Defendants from any further action related to the Property.

25   ///

26   ///

27   ///

28   ///

# XI: THIRD CAUSE OF ACTION-DECLARATORY RELIEF: TO DETERMINE STATUS OF DEFENDANTS' CLAIMS
## [28 U.S.C.§§ 2201,2202]
### [Against All Defendants and Doe Defendants]

91. The Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

92. Section 2201(a) of Title 28 of the United States Code states: *"In case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an anti dumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether, or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."*

93. Section 2202 of Title 28 of the United States Code states: *Further necessary or proper relief based on declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.*

94. Plaintiff alleges that neither Defendants nor any other Doe Defendants have a secured or unsecured legal, equitable, or pecuniary interest in the lien evidenced by the Deed of Trust and that its purported *"Assignments"* have no value since the Deed of Trust is wholly unsecured.

95. On or about March 20, 2012 the Defendants claim they had transferred a secured enforceable interest in, and perfected lien against, the Plaintiffs' Note, deed of Trust and Property.

96. Thus, the competing allegations made by Plaintiff, above, establish that a real and actual controversy exists as to the respective rights of the parties to the matter, including ownership of the Property.

97. Accordingly, Plaintiff requests that the Court make a finding and issues appropriate orders stating that none of the named Defendants or Doe Defendants, have any right or interest in Plaintiffs' Note, Deed of Trust, or the Property which authorizes them, in fact or as a matter of law, to collect Plaintiffs' mortgage payments or enforce the terms of the alleged Note or Deed of Trust in any manner whatsoever.

98. The Plaintiff will suffer prejudice if the Court does not determine the rights and obligations of the parties because: (1) Plaintiff will be denied the opportunity to identify her true and current creditor/lender and to negotiate with them; (2) They will be denied the right to conduct discovery and have the Defendants and other Doe Defendants' claims verified by a custodian of records who has personal knowledge of the loan and all transactions related to it; and (3) they will be denied the opportunity to discover the true amount they still owe minus any legal costs, fees and charges.

99. Due to the actual case and controversy regarding competing claims and the allegations, it is necessary that the court declare the actual rights and obligations of the parties and make a determination as to whether "Jason Larocca", and other Doe Defendants' claims against the Plaintiffs are enforceable and whether it is secured or unsecured by any right, title, or interest in Plaintiffs' property.

100. Furthermore, the conduct of "Jason Larocca" and "Andrea L. Hartle" as agents, and one or more of the Doe Defendants, and each them, as herein

1   described, has been so malicious and contemptible that it would be looked down

2   upon and despised by ordinary people.  Plaintiff is therefore entitled to punitive

3   damages in an amount appropriate to punish Defendants and to deter others from

4   engaging in similar conduct.

## XII: FOURTH CAUSE OF ACTION - NEGLIGENCE

### [Against All Defendants and Doe Defendants]

7       101.  The Plaintiff hereby incorporates by reference each and every one of

8   the preceding paragraphs as if the same were fully set forth herein.

9       102.  At all times relevant herein, CITI, was acting as a purported agent for

10   parties unknown at this time.  Defendants are jointly and severally liable for

11   Citimortgage Inc's, negligent and reckless conduct.

12       103.  Defendant MCM and REO III as the purported beneficiary of the Note

13   and Deed of Trust, and Defendant CITI, as purported mortgage servicer, all have a

14   duty to exercise reasonable care[11] and skill to follow California law with regard to

15   enforcement of monetary obligations, and to refrain from taking or failing to take

16   any action against Plaintiffs that they did not have the legal authority to do.  This

17   includes not collecting or demanding mortgage payments when they do not have

18   the right to enforce the obligation, causing the Plaintiffs to overpay in interest,

19   entering into a contract for the sole purpose of maximizing profits without proper

20   considerations as set forth by the DOT , making derogatory credit reports to credit

21   bureaus, and failing to keep an accurate accounting of Plaintiffs mortgage

22   payments, credits, and debits (if CITI was in fact the legal authorized mortgage

23   servicer for the Plaintiffs).

24

25   [11]  Normally lenders and servicers do not owe a borrower a duty of care. *Nymark v. Heart Fed.*

26   *Savings & Loan Assn.*, 231 Cal. App.3d 1089, 1093 (1991). However, a bank may be liable in
negligence if it fails to discharge its contractual duties with reasonable care. Das v. bank of Am,

27   186 Cal.App.4th 727,741 (2010). Additionally, a bank may be liable for aiding and abetting a
tort when it renders "substantial assistance" to a tortfeasor during a business transaction that it

28   knowingly aided in the commission of the tort. Id (citing *Casey v. U.S. Bank Nat .Assn.* 127 Cal.
App. 4th 1138, 1144-45).

104. CITIMORTGAGE INC. and DOE Defendants all; have a duty to exercise reasonable care and skill to refrain from taking any action against Plaintiff that they do not have the legal authority to do. As a direct and proximate result of the reckless negligence, utter carelessness, and blatant fraud of the Defendants as set forth above, the chain of title to Plaintiffs' Property has been rendered unmarketable and fatally defective and has caused Plaintiff to lose saleable title to the subject property.

105. CITIMORTGAGE INC., breached its duty when they failed to follow the guidelines established by the DOT requiring the proper due diligence to be done before the offering of Loan Modification proposal and the subsequent actions taken by the Defendants in order to accelerate the loan for the purpose of dispossessing the Property from the Plaintiff.

106. As a direct and proximate result of the negligence and carelessness of the Defendants as set forth above, Plaintiff suffered, and continues to suffer, general and special damages in an amount to be determined at trail, including attorneys' fees and costs of bringing suit to dispute, validate, and challenge said Defendants' purported rights to enforce the Plaintiffs' alleged debt obligation against them.

## XIII: FIFTH CAUSE OF ACTION-QUASI CONTRACT
### [Against All Defendants and Doe Defendants]

107. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

108. Citimortgage Inc., demanded monthly mortgage payments from Plaintiffs and continued to collect payments from Plaintiff. Plaintiff reasonably relied upon Citimortgage Inc., assertion that it/they are/were entitled to the benefit of Plaintiff's mortgage payments.

109. Citimortgage Inc., knowingly accepted payments and retained them for its own use knowing that Citimortgage Inc., did not acquire an interest in

Plaintiffs' Note, such that they could accept or keep Plaintiffs' payments.  It would be inequitable for Citimortgage Inc., to retain the payments it received from Plaintiff which it did not have legal authority to collect.   The equitable remedy of restitution when unjust enrichment has occurred is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to their former position by return of the thing or its equivalent in money.

110. Section 23 of the Deed of Trust states that:

"Upon payment of all the sums secured by this Security Instrument, Lender shall request Trustee to re-convey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  "Trustee shall re-convey the Property without warranty to the person or persons legally entitled to it."  The obligations to Metrocities Mortgage; under the Deed of Trust were fulfilled when Metrocities Mortgage; received the balance on the Note as proceeds of sale Plaintiffs' Note and Mortgage to a presently unknown entity ;  Defendant Citimortgage Inc. has been unjustly enriched by collecting monthly payments from Plaintiff when it has no interest in their Note.

111. Plaintiff seeks restitution for any payments they were made to Citimortgage Inc.; those were not paid to the lender or beneficiary, if any.

## XIV: SIXTH CAUSE OF ACTION – FOR VIOLATION OF
## 15 U.S.C. § 1692, ET SEQ.
### [Against All Defendants and Doe Defendants]

112. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

113. Federal law prohibits the use of any "any false, deceptive, or misleading representation or means in connection with the collection of any debt; including the false representation of "the character, amount, or legal status of any debt" and the threat to take any action that cannot legally be taken…"; Defendant

Citimortgage Inc. and Doe Defendants have communicated to the Plaintiff by and through federal disclosures on four different occasions that they are "Debt Collectors and all information gathered will be used in collecting this Debt",  the Defendant has also purported themselves to be the "creditor" of the alleged debt. In addition; the Defendant Citimortgage Inc. and Doe Defendants, have disclosed to the Plaintiffs that they are the owners of the Plaintiffs' "Mortgage" on  different occasions from the time that the Plaintiffs was told to stop paying the payments on the alleged debt in order to be assisted.

114.   In illegally attempting to collect on Plaintiffs' debt obligation in the manner described herein, Defendant MCM and REO III as the purported assignee[12], and Citimortgage Inc., as purported mortgage servicer: falsely represented the status of the debt, in particular, that it was due and owing to Defendant REO III at the time the suit was filed; falsely represented or implied that the debt was owing to Defendants  REO III as an innocent purchaser *for value*, when in fact, such an assignment had not been accomplished; threatened to take action, namely engaging in collection activities that cannot legally be taken by them; and attempted to collect on the promissory note under false pretenses; namely that REO III was assigned Plaintiff's debt when in fact they were not.

115.   Illegally collecting on alleged debts that were in default. "The Senate report emphasized the application of this section 15 U.S.C. § 1692(a) §§ 4.3.10 to mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default when taken for servicing. The Defendants violated the statute by their alleged assignments being filed many months after the debt had been in default.

116.   The Defendants have misrepresented the "character, amount and the legal status of the alleged debt" along with attempting to collect on defaulting debts

---

[12] [15 U.S.C § 1641 (f)(1)] Treatment of Servicer: A Servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as an assignee of such obligation for the purposes of this section unless the servicer is/ was the owner of the obligation.

on behalf of others.  The Defendant Citimortgage Inc., or other Doe Defendants have misrepresented their roles and have attempted to deceive the Plaintiff into believing that they are the legal owners of the debt.  The Defendants actions has induced the Plaintiff into becoming delinquent on payments that they have/had no right to collect; they have caused the Plaintiff to enter into a contract which the Defendant had no intention of honoring; in addition the Defendants' actions have caused the Plaintiff creditworthiness and credit standing to be damaged by the misreporting of delinquencies that were caused by the Defendants.

117.   Thus, Citimortgage Inc. , MCM and REO III have violated 15 U.S.C. § 1692 et seq., and its subject to statutory damages, civil liability, penalties, attorneys' fees and actual damages. *See* 15 U.S.C. § 1692. The actual pecuniary damages include, but are not limited to, the over calculation and overpayment of interest and principle on Plaintiff's loan, the costs of repairing Plaintiff's credit, the reduction and/or elimination of Plaintiffs' credit limits, costs associated with removing the cloud on their property title and setting aside the trustee's sale, and attorneys' fees and costs, in an amount to be proven at trial, but in excess of $75,000.00.

118.   As a direct and proximate result of the violations of Fair Debt Collection Practice Act by Defendants CITI, MCM and REO III; Plaintiffs have suffered actual pecuniary damages, including but not limited to statutory damages, civil liability, and attorneys' fees, in an amount to be proven at trial.

## XV:  SEVENTH CAUSE OF ACTION – VIOLATION OF
## 15 U.S.C. §§ 1641

### [Against All Defendants and Doe Defendants]

119.  Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

120. It has been the intent of Congress to make sure that all transactions related to the origination and extension of consumer credits to be in compliance with full disclosure of the facts related to the transaction.

121. The Plaintiff is informed and alleges that the Defendant CITI and one or more Doe Defendants have failed to make the correct and proper disclosures as set forth in this title under the required timelines.

122. The Defendant MCM and REO III entered the picture of this transaction on or about 2012 , at which time they were required to make the appropriate disclosures as to the role of the alleged Servicer, Assignee, or the owner of the debt.

123. The Plaintiff also alleges that the Servicer and the Assignee of the debt cannot be the same party pursuant to this title.

124. The Plaintiff alleges that the Defendant failed to file the proper disclosures under 15 U.S.C. § 1641(g).

125. The Plaintiff alleges that the Defendants lack of disclosure was due to their lack of standing as a true assignee of the debt; as such the Defendants lack the authority or the legal right to ask for the Plaintiffs' payments.  In light of the Defendants constant role switching and misrepresentation, the Plaintiff now re-alleges that the Defendants Citimortgage Inc., MCM and REO III are financial agents hired to collect on behalf of parties unknown; the Defendants owe a duty of care under 15 U.S.C § 1641 to properly disclose their standing and role to the Plaintiff in order for the Plaintiff to properly identify the parties that are owed.  Instead the Defendants play a hide and seek game to avoid full disclosure of their roles; the Plaintiff cannot deduct anything but to assume that the Defendants are wrong doers.  The intent for the disclosure laws are for the parties to operate in an environment of fairness and equitability for all parties. The actions of the Defendants cause chaos, confusion, anxiety, and litigation.  The Plaintiff alleges

1    that the actions of the Defendants are conducted in such a manner as to bring

2    unjust enrichment and profits through acts of fraud and deceit.

3        126. The Defendants actions from the first contact to the filing of this

4    complaint have been done under a veil of mystery which has been designed to hide

5    the facts and to deceit. The actions of the Defendants are unlawful as they are

6    bound by duties set forth to conduct themselves as entities that deserve to be

7    assisted by the public coffers and taxpayer assistance. The Defendants lack of

8    disclosure and proper compliance has set the stage for the Plaintiff to go into

9    default to be assisted, to enter into a contract which was done to fail, and now the

10   cat and mouse game of finding the true holder of the alleged debt. The fact is that

11   Defendants make more money by circumventing the compliances set forth by the

12   respective Government agencies. The Plaintiff asks the court to put a STOP to this

13   and to order the Defendants to come forth and to conduct themselves as business

14   people.

## XVI: EIGHT CAUSE OF ACTION – VIOLATION OF
## BUS. AND PROF. CODE SECTION 17200, ET SEQ.
### [Against All Defendants and Doe Defendants]

18       127. Plaintiff hereby incorporates by reference each and every one of the

19   preceding paragraphs as if the same were fully set forth herein.

20       128. Defendants' conduct, for the reasons stated herein, is in direct violation

21   of 12 U.S.C. § 2605(e), et seq.

22       129. Defendants' conduct, for the reasons stated herein, is in direct violation

23   of Cal. Penal Code section 532(f) (a) (4).

24       130. Cal. Bus and Prof. Code section 17200, et seq., prohibits acts of unfair

25   completion, which means and includes any unlawful, unfair, or fraudulent business

26   act and conduct which is likely to deceive and is fraudulent in nature.

27

28

131.  As more fully described above, Defendants' acts and practices are unlawful, unfair, and fraudulent. This conduct is ongoing and continues to this date.

132.  Defendants engage in unfair, unlawful[13], and fraudulent business practices with respect to mortgage loan servicing, and related matters by, among other things:

    a)  executing and recording false and misleading documents[14];

    b)  executing and recording documents without the legal authority to do so;

    c)  Using other corporate names and individuals to commit fraud

    d)  Using individuals to file and record paperwork that is fraudulent

    e)  failing to disclose the principal for which documents were being executed and recorded in violation of Cal. Civ. Code section 1095;

    f)  demanding and accepting payments for debts that were non-existent;

    g)  violating the Security First Rule;

    h)  Entering into contracts that they know is set up to fail

    i)  Collection and intentional misallocation of funds

    j)  Disclosing themselves as multiple parties that claim to have pecuniary rights and legal rights to the Property

    k)  reporting payments as late to credit bureaus  without the legal right or authority to do so;

---

[13] "Unlawful" acts or practices are those forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, or court-made. *Sanders v. Superior court*, 27 Cal.4th 832(1994); *Hewlett v. Squaw Valley*, 54 Cal.4th 499(1997).

[14] Defendants' recording of the Assignment of Deed of Trust violates Cal. Penal Code section 532 (f)(a)(4), which prohibits any person from filing a document related to a mortgage loan transaction with the county recorder's office which that person knows to contain a deliberate misstatement, misrepresentation, or omission. The facts demonstrate that Defendants have committed mortgage fraud by filing the Assignment of Deed of Trust with the county recorder's office with the knowledge that the document contained a deliberate misstatement, misrepresentation, or omission of fact.

l)  Failing to file the required disclosures under federal law

m) Failing to answer the inquires of the Plaintiff as afforded by law

n)  Submitting false reports to the DOT as to their activities involving the servicing and collection of funds

o)  acting as beneficiary without the legal authority to do so, and;

p)  Other deceptive business practices as described herein.

133.  As more fully described above, Defendants' acts and practices are likely to deceive members of the public.

134.  Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein; Defendants violate several laws including Cal Bus. And Prof. Code section 17200, et seq. and must be required to disgorge all profits related to their unfair, unlawful, and deceptive business practices.

135. Plaintiff alleges that Defendants' misconduct, as alleged herein, gave Defendants an unfair competitive advantage over competitors. The scheme implemented by Defendants is designed to defraud California consumers and enrich the Defendants.

136.  The foregoing acts and practices have caused substantial harm to California consumers, including Plaintiff.

137.  By reason of the foregoing, Defendants have been unjustly enriched and should be required to make restitution to Plaintiff and other California consumers who have been harmed, and/or be enjoined from continuing in such practices pursuant to Cal. Bus., and Prof. Code sections 17203 and 17204.

138.  As a direct and proximate result of the actions of Defendants, and each of them, stated above, Plaintiffs have been injured in that a cloud has been placed upon title to Plaintiff's Property and Defendants, have failed to remove this cloud from plaintiff's title.

139.  Plaintiff is entitled to an order compelling Defendants and any other Doe Defendants claiming an interest in and to the Property to take any and all

1    actions necessary to remove the cloud they have placed upon his title and an order

2    enjoining such Defendants from taking such action again in the future.

3    ## XVII: **WHEREFORE, PLAINTIFFS' PRAYERS ARE AS FOLLOWS:**

4        1. For compensatory, special and general damages in an amount according

5    to proof at trail, but not less than $ 10,000,000.00, against all Defendants;

6        2. For punitive and exemplary damages in an amount to be determined by

7    the Court against all Defendants;

8        3. For an order compelling Defendants or Doe Defendants to remove any

9    instrument which does or could be construed as constituting a cloud upon

10   Plaintiffs' title to the Property, including the purported "Assignment of Deed of

11   Trust";

12       4. For an order finding that Defendants have no legally cognizable rights as

13   to Plaintiffs', the Property, Plaintiffs' Promissory Note, Plaintiffs' Deed of Trust or

14   any other matter based on contract or any of the documents prepared by

15   Defendants, tendered to and executed by Plaintiffs;

16       5. For the Court to issue an order restraining Defendants or Doe Defendants,

17   their agents or employees from continuing or initiating any action against the

18   Property and enjoining Defendants, her agents or employees from doing so during

19   the pendency of the matter;

20       6. For an order compelling Defendants to disgorge all amounts wrongfully

21   taken by them from Plaintiff and returning the same to Plaintiffs' interest thereon

22   at the statutory rate from the date the funds were first received from Plaintiffs;

23       7. For an order compelling Defendants to cancel any ongoing foreclosure

24   proceeding and to remove the Property from any foreclosure database.

25       8. For the Defendants to remove all derogatory items reported on the

26   Plaintiffs credit reports.

27       9.  For costs of suit incurred herein; and attorneys' fees

28       10. For such other and further relief as the Court may deem proper.

Dated: August 27, 2012

By: _Charlotte Spadaro_

Charlotte Spadaro,
Attorney for Plaintiff

## LIST OF EXHIBITS

Pursuant to *18 U.S.C. 1961(9),* Plaintiff now formally incorporates her and her *documentary material* by reference to all of the following Exhibits, as if set forth fully here, to wit:

The number of pages shown includes the cover page:

Exhibit A - "Assignment of Deed of Trust" from MERS to MCM Capital - 3 pages

Exhibit B - "Assignment of Deed of Trust" from MCM Capital to Newbury Place REO III – 2 pages

Exhibit C - A correct copy of the Securitization Report – 22 pages

Exhibit D - MERS's own "Terms and Conditions" - 3 pages

Exhibit E - "Jason Larocca" employment - 2 pages

Exhibit F – Federal Reserve Report on Servicers - 19 pages

Total number of Exhibit pages attached – 51

# EXHIBIT A

RECORDER MEMO: This COPY is NOT an OFFICIAL RECORD.



**This page is part of your document - DO NOT DISCARD**

## 20120653445



Pages:
0002

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**05/02/12 AT 11:27AM**

| | |
|---|---|
| FEES: | 18.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 18.00 |



**L E A D S H E E T**

201205020840042

00005701788

003944711

**SEQ:**
**02**

DAR - Mail (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

RECORDER MEMO: This COPY is NOT an OFFICIAL RECORD.

RECORDER MEMO: This COPY is NOT an OFFICIAL RECORD.

Recording Requested by: M. E. Wileman

PLEASE FORWARD RECORDED DOCUMENT TO:
MCM CAPITAL HOMEOWNERS ADVANTAGE
TRUST IX
c/o M. E. Wileman
2860 Exchange Blvd. # 100
Southlake, TX 76092



**Assignment of Deed of Trust**     Send Any Notices To Assignee.

For Valuable Consideration, the undersigned, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS")
AS NOMINEE FOR METROCITIES MORTGAGE, LLC ITS SUCCESSORS AND ASSIGNS P.O. Box 2026, Flint, MI
48501-2026 (Assignor)** by these presents does assign and set over, without recourse, to **MCM CAPITAL HOMEOWNERS
ADVANTAGE TRUST IX  7500 Old Georgetown Road, Suite 1300, Bethesda, MD 20814 (Assignee)** the described deed of
trust with all interest, all liens, any rights due or to become due thereon, executed by **MAY SHAKTAH, A MARRIED
WOMAN AS HER SOLE AND SEPARATE PROPERTY** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,
INC. ('MERS') AS NOMINEE FOR METROCITIES MORTGAGE, LLC ITS SUCCESSORS AND ASSIGNS.**   Said deed of
trust Dated: 8/17/2005 is recorded in the State of CA, County of Los Angeles on 8/19/2005, Document 05 1997819
**AMOUNT: $1,000,000.00**     Property Address: 4407 ALTA TUPELO DRIVE, CALABASAS, CA 91302

IN WITNESS WHEREOF, the undersigned corporation/trust has caused this instrument to be executed as a sealed instrument by
its proper officer. Executed on: 3/20/12
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR METROCITIES
MORTGAGE, LLC ITS SUCCESSORS AND ASSIGNS

By:

Jason Larocca, Assistant Secretary

SHAKTAH   YMG *12013303*

State of Maryland County of Washington
    Before me, Andrea L Hartle , Notary Public, personally appeared, Jason Larocca, Assistant Secretary known
to me to be the person(s) whose name(s) is subscribed to the foregoing instrument and acknowledged to me that he/she executed
the same for the purposes and consideration therein expressed.
Given under my hand and seal of office on 3/20/12

ANDREA L. HARTLE
Washington County
State of Maryland
My Commission Expired May 11, 2014

Notary public: Andrea L Hartle
My commission expires: May 11, 2014

MIN 100034200002543571 MERS Phone 888-679-6377
CA  Los Angeles                     CITICAP/WL94/ASMT

RECORDER MEMO: This COPY is NOT an OFFICIAL RECORD.

# EXHIBIT B

This page is part of your document - DO NOT DISCARD



## 20120815905

Pages: 0003

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

06/01/12 AT 08:00AM

| | |
|---|---|
| FEES: | 21.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 21.00 |



LEADSHEET



201206010140015

00005900434

004035842

SEQ:
08

DAR - Title Company (Hard Copy)

THIS FORM IS NOT TO BE DUPLICATED          T29

Branch :ROJ,User :5450                    Comment:                                    Station Id :ZG3J

**FIRST AMERICAN TITLE COMPANY**

*When Recorded mail To:*

Newbury Place REO III LLC
c/o BSI Financial Services Inc
7500 Old Georgetown Rd.
Bethesda, MD 20814



05/01/2012

*20120815905*

## ASSIGNMENT OF MORTGAGE / SECURITY DEED / DEED OF TRUST

Loan No: 229262768

For good and valuable consideration, the sufficiency of which is hereby acknowledged, the undersigned, **MCM Capital Homeowners Advantage Trust IX**, whose address is 7500 Old Georgetown Road, Suite 1300, Bethesda, MD 20814, (ASSIGNOR), by these presents does convey, grant, sell, assign, transfer and set over the described mortgage / security deed / deed of trust together with the certain note(s) described therein together with all interest secured thereby, all liens, and any rights due or to become due thereon to **Newbury Place REO III, LLC**, whose address is 7500 Old Georgetown Road, Suite 1300, Bethesda, MD 20814, its successors or assigns, (ASSIGNEE).

Said mortgage / security deed / deed of trust dated 08/17/05 in the amount of $1,000,000.00 executed by **MAY SHAKTAH** to **MERS** as nominee for **METROCITIES MORTGAGE, LLC** and recorded on 08/19/05 as Instrument # 05 1997819 in the office of the Recorder of LOS ANGELES County, CA.

PROPERTY ADDRESS:  4407 ALTA TUPELO DRIVE, CALABASAS, CA  91302
LEGAL DESCRIPTION:  See Attached Exhibit A

In testimony whereof, the said trust has caused this instrument to be executed in its name by its administrator on this 23rd day of May, 2012.

MCM Capital Homeowners Advantage Trust IX by MCM Capital Partners, LLC its administrator

By: _____          By: _____

Name: Michael Niccolini               Name: Steven Trowern

Its:  Managing Member                 Its:  Member

Witness: _____        Witness: _____

Name:   Tanya Dooley                     Name:   Jamie Brown

Prepared by:    Zar Tun
                7500 Old Georgetown Road, Suite 1300
                Bethesda, MD  20814

Loan No: 229262768

State of Maryland                        )ss.:

County of Montgomery                     )

On this  23rd day of  May, 2012, before me, personally appeared Michael Niccolini and  Steven Trowern, personally known to me, or proved to me on the basis of satisfactory evidence, to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument and such individual made such appearance before the undersigned in the State of Maryland, County of Montgomery.

Notary: _____

Name:   Benjamin Aaron Sislen

Expires: 3/31/2015

BENJAMIN AARON SISLEN
Notary Public-Maryland
Montgomery County
My Commission Expires
March 31, 2015

# EXHIBIT C



# PROPERTY SECURITIZATION ANALYSIS REPORT

*"This is a Securitization Analysis Report and not a Forensic Audit Report"*

*Borrower:*

## MAY SHAKTAH





# SECTION 1: TRANSACTION DETAILS

**BORROWER:**
**MAY SHAKTAH**

**SUBJECT ADDRESS:**
**4407 ALTA TUPELO DRIVE,**
**CALABASAS, CA 91302**

**MORTGAGE SERVICER:**

**CITIMORTGAGE INC**

**ORIGINAL MORTGAGE LENDER:**

**METROCITIES MORTGAGE, LLC**
**MIN 1000342-0000254357-1**
**LOAN NUMBER 21043552**

**MORTGAGE NOMINEE / BENEFICIARY:**

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**

**MORTGAGE TRUSTEE:**

**FIDELITY NATIONAL LOAN PORTFOLIO SOLUTIONS**

**TITLE COMPANY:**

**EQUITY TITLE**

Page | 1



# SECTION 2: SECURITIZATION
## SECURITIZATION PARTICIPANTS:

**ORIGINATOR / LENDER:**

**METROCITIES MORTGAGE, LLC**



**SPONSOR / SELLER:**

**EMC MORTGAGE CORPORATION**

**ISSUING ENTITY:**

**BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2005-AC9**

**CUT-OFF DATE:**
**NOVEMBER 1, 2005**

**CLOSING DATE:**
**ON OR ABOUT NOVEMBER 30, 2005**



**DEPOSITOR:**

**BEAR STEARNS ASSET BACKED SECURITIES I LLC**

**TRUSTEE:**

**U.S. BANK NATIONAL ASSOCIATION**

**MASTER SERVICER / SERVICER:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**



**$390,355,504**
**(Approximate)**
**Bear Stearns Asset Backed Securities I Trust 2005-AC9**
**Issuer**
**Asset-Backed Certificates, Series 2005-AC9**
**EMC Mortgage Corporation**
**Seller**
**Wells Fargo Bank, National Association**
**Master Servicer and Securities Administrator**
**Bear Stearns Asset Backed Securities I LLC**
**Depositor**

**The Certificates**
Asset-Backed Certificates, Series 2005-AC9, represent beneficial ownership interests in a trust fund that consists primarily of a pool of fixed rate, conventional mortgage loans that are secured by first liens on one- to four-family residential properties and certain other assets described in this prospectus supplement.

**Originators**
Waterfield Mortgage Company, Inc. is the originator with respect to approximately 24.91% of the mortgage loans. Impac Funding Corporation is the originator with respect to approximately 10.77% of the mortgage loans. The remainder of the mortgage loans were originated by various originators, none of which have originated more than 10% of the mortgage loans.

**Depositor**
Bear Stearns Asset Backed Securities I LLC, a Delaware limited liability company and a limited purpose finance subsidiary of The Bear Stearns Companies Inc. and an affiliate of Bear, Stearns & Co. Inc.

**Seller**
EMC Mortgage Corporation, a Delaware corporation and an affiliate of the depositor and Bear, Stearns & Co. Inc., which will sell the mortgage loans to the depositor.

**Master Servicer**
Wells Fargo Bank, National Association, a national banking association.

**Securities Administrator**
Wells Fargo Bank, National Association, a national banking association.

**Trustee**
U.S. Bank National Association, a national banking association.

**Cut-off Date**
The close of business on November 1, 2005.

**Closing Date**
On or about November 30, 2005.



**Assignment of the Mortgage Loans; Repurchase**

At the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due with respect to such mortgage loans after the cut-off date to be sold to the trust. The mortgage loans will be identified in a schedule appearing as an exhibit to the pooling and servicing agreement. Such schedule will include information as to the principal balance of each mortgage loan as of the cut-off date, as well as information including, among other things, the mortgage rate, the borrower's monthly payment and the maturity date of each mortgage note.

In addition, the depositor will deposit with Wells Fargo Bank, National Association, as custodian and agent for the trustee, for the benefit of the certificateholders and the Class A-5 Insurer, the following documents with respect to each mortgage loan:

(a) the original mortgage note, endorsed without recourse in the following form: "Pay to the order of U.S. Bank National Association, as trustee for certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2005-AC9 without recourse," with all intervening endorsements that show a complete chain of endorsement from the originator to the seller or, if the original mortgage note is unavailable to the depositor, a photocopy thereof, if available, together with a lost note affidavit;

(b)     the original recorded mortgage or a photocopy thereof;

(c) a duly executed assignment of the mortgage to "U.S. Bank National Association, as trustee for certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2005-AC9, without recourse" in recordable form or, for each mortgage loan subject to the Mortgage Electronic Registration Systems, Inc. (the "MERS® System"), evidence that the mortgage is held for the trustee as described in the pooling and servicing agreement;

(d) all interim recorded assignments of such mortgage, if any and if available to the depositor; and

(e) the original or duplicate original lender's title policy or, in the event such original title policy has not been received from the insurer, such original or duplicate original lender's title policy shall be delivered within one year of the Closing Date or, in the event such original lender's title policy is unavailable, a photocopy of such title policy or, in lieu thereof, a current lien search on the related property.

With respect to each mortgage loan subject to the MERS® System, in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. ("MERS"), the assignment of the mortgage related to each such mortgage loan shall be registered electronically through the MERS® System and MERS shall serve as mortgagee of record solely as nominee in an administrative capacity on behalf of the trustee and shall not have any interest in such mortgage loans.

Assignments of the mortgage loans provided to the custodian on behalf of the trustee will be recorded in the appropriate public office for real property records, except (i) in states as to which an opinion of counsel is delivered to the trustee and the Class A-5 Insurer to the effect that such recording is not required to protect the trustee's interests in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or the seller, or (ii) with respect to any mortgage loan electronically registered through the MERS® System. The seller shall be responsible for the recordation of such assignments and the costs incurred in connection therewith.

The custodian on behalf of the trustee will perform a limited review of the mortgage loan documents on or prior to the Closing Date or in the case of any document permitted to be delivered



after the Closing Date, promptly after the custodian's receipt of such documents and will hold such documents in trust for the benefit of the holders of the certificates and the Class A-5 Insurer.

In addition, the seller will make representations and warranties in the mortgage loan purchase agreement between the seller and the depositor. The seller is required, pursuant to the pooling and servicing agreement, to represent and warrant that the representations and warranties contained in the mortgage loan purchase agreement are true and correct as of the Closing Date. All of depositor's right, title and interest in the mortgage loans and all rights of the depositor under the mortgage loan purchase agreement will be assigned to the trustee pursuant to the pooling and servicing agreement. A form of the mortgage loan purchase agreement containing such representations and warranties will be attached as an exhibit to the pooling and servicing agreement. The depositor will file the pooling and servicing agreement along with the exhibits to the pooling and servicing agreement with the Securities and Exchange Commission in a report on Form 8-K.

After the Closing Date, if any document is found to be missing or defective in any material respect, or if a representation or warranty with respect to any mortgage loan is breached and such breach materially and adversely affects the interests of the holders of the certificates in such mortgage loan (without regard to the Class A-5 Policy issued by the Class A-5 Insurer) or the interests of the Class A-5 Insurer, the trustee is required to notify the seller and the Class A-5 Insurer in writing. If the seller cannot or does not cure such omission, defect or breach within 60 days of its receipt of notice from the custodian, the seller is required to repurchase the related mortgage loan from the trust fund at a price equal to 100% of the Stated Principal Balance thereof as of the date of repurchase plus accrued and unpaid interest thereon at the mortgage rate to the first day of the month following the month of repurchase, plus any costs and damages incurred by the trust in connection with any violation of such mortgage loan of any anti-predatory lending laws, and reduced by any portion of the servicing fee or advances payable to the purchaser of the mortgage loan. Rather than repurchase the mortgage loan as provided above, the seller may remove such mortgage loan from the trust fund and substitute in its place another mortgage loan of like characteristics; however, such substitution is only permitted within two years after the Closing Date.

With respect to any repurchase or substitution of a mortgage loan that is not in default or as to which a default is not imminent, the trustee and the Class A-5 Insurer must have received a satisfactory opinion of counsel that such repurchase or substitution will not cause the trust fund to lose the status of its REMIC elections or otherwise subject the trust to a prohibited transaction tax. The obligation to cure, repurchase or substitute as described above constitutes the sole remedy available to the certificateholders, the trustee or the depositor for omission of, or a material defect in, a mortgage loan document or for a breach of representation or warranty by the seller with respect to a mortgage loan.

424B5: (PROSPECTUS)
http://www.sec.gov/Archives/edgar/data/1283557/000088237705003397/d398976_424b5.htm



BEAR STEARNS ASSET BACKED SECURITIES I LLC,
Depositor
EMC MORTGAGE CORPORATION,
Seller and Company
WELLS FARGO BANK, NATIONAL ASSOCIATION,
Master Servicer and Securities Administrator
and
U.S. BANK NATIONAL ASSOCIATION,
Trustee

POOLING AND SERVICING AGREEMENT
Dated as of November 1, 2005

BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2005-AC9
ASSET-BACKED CERTIFICATES, SERIES 2005-AC9

## ARTICLE II
## CONVEYANCE OF TRUST FUND
## REPRESENTATIONS AND WARRANTIES
Section 2.01   Conveyance of Trust Fund.

Pursuant to the Mortgage Loan Purchase Agreement, the Seller sold, transferred, assigned, set over and otherwise conveyed to the Depositor, without recourse, all the right, title and interest of the Seller in and to the assets in the Trust Fund.

The Seller has entered into this Agreement in consideration for the purchase of the Mortgage Loans by the Depositor pursuant to the Mortgage Loan Purchase Agreement and has agreed to take the actions specified herein.

The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the use and benefit of the Certificateholders and the Class A-5 Insurer, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund. In addition, on or prior to the Closing Date, the Depositor shall cause the Class A-5 Insurer to deliver the Class A-5 Policy to the Trustee with a copy to the Securities Administrator.

In connection with such sale, the Depositor has delivered to, and deposited with, the Trustee or the Custodian, as its agent, the following documents or instruments with respect to each Mortgage Loan so assigned: (i) the original Mortgage Note, including any riders thereto, endorsed without recourse (A) to the order of "U.S. Bank National Association, as Trustee for certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset Backed Certificates, Series 2005-AC9," or (B) in the case of a loan registered on the MERS system, in blank, and in each case showing to the extent available to the Seller an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee, (ii) the original Mortgage and, if the related Mortgage Loan is a MOM Loan, noting the presence of the MIN and language indicating that such Mortgage Loan is a MOM Loan, which shall have been recorded (or if the original is not available, a copy), with evidence of such recording indicated thereon (or if clause (x) in the proviso below applies), shall be in recordable form), (iii) unless the Mortgage Loan is a MOM Loan, the assignment (either an



original or a copy, which may be in the form of a blanket assignment if permitted in the jurisdiction in which the Mortgaged Property is located) to the Trustee of the Mortgage with respect to each Mortgage Loan in the name of "U.S. Bank National Association, as Trustee for certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset Backed Certificates, Series 2005-AC9," which shall have been recorded (or if clause (x) in the proviso below applies, shall be in recordable form) (iv) an original or a copy of all intervening assignments of the Mortgage, if any, to the extent available to the Seller, with evidence of recording thereon, (v) the original policy of title insurance or mortgagee's certificate of title insurance or commitment or binder for title insurance, if available, or a copy thereof, or, in the event that such original title insurance policy is unavailable, a photocopy thereof, or in lieu thereof, a current lien search on the related Mortgaged Property and (vi) originals or copies of all available assumption, modification or substitution agreements, if any; provided, however, that in lieu of the foregoing, the Seller may deliver the following documents, under the circumstances set forth below: (x) if any Mortgage, assignment thereof to the Trustee or intervening assignments thereof have been delivered or are being delivered to recording offices for recording and have not been returned in time to permit their delivery as specified above, the Depositor may deliver a true copy thereof with a certification by the Seller or the title company issuing the commitment for title insurance, on the face of such copy, substantially as follows: "Certified to be a true and correct copy of the original, which has been transmitted for recording" and (y) in lieu of the Mortgage Notes relating to the Mortgage Loans identified in the list set forth in Exhibit I, the Depositor may deliver a lost note affidavit and indemnity and a copy of the original note, if available; and provided, further, however, that in the case of Mortgage Loans which have been prepaid in full after the Cut-off Date and prior to the Closing Date, the Depositor, in lieu of delivering the above documents, may deliver to the Trustee and its Custodian a certification of a Servicing Officer to such effect and in such case shall deposit all amounts paid in respect of such Mortgage Loans, in the Master Servicer Collection Account or in the Distribution Account on the Closing Date. In the case of the documents referred to in clause (x) above, the Depositor shall deliver such documents to the Trustee or its Custodian promptly after they are received. The Seller shall cause, at its expense, the Mortgage and intervening assignments, if any, and to the extent required in accordance with the foregoing, the assignment of the Mortgage to the Trustee to be submitted for recording promptly after the Closing Date; provided that the Seller need not cause to be recorded any assignment (a) in any jurisdiction under the laws of which, as evidenced by an Opinion of Counsel addressed to the Trustee and the Class A-5 Insurer delivered by the Seller to the Trustee and the Rating Agencies, the recordation of such assignment is not necessary to protect the Trustee's interest in the related Mortgage Loan or (b) if MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage as mortgagee of record solely as nominee for Seller and its successors and assigns. In the event that the Seller, the Depositor or the Master Servicer gives written notice to the Trustee that a court has recharacterized the sale of the Mortgage Loans as a financing, the Seller shall submit or cause to be submitted for recording as specified above or, should the Seller fail to perform such obligations, the Master Servicer shall cause each such previously unrecorded assignment to be submitted for recording as specified above at the expense of the Trust. In the event a Mortgage File is released to the Company or the Servicer as a result of such Person having completed a Request for Release, the Custodian shall, if not so completed, complete the assignment of the related Mortgage in the manner specified in clause (iii) above.

In connection with the assignment of any Mortgage Loan registered on the MERS® System, the Seller further agrees that it will cause, at the Seller's own expense, within 30 days after the Closing Date, the MERS® System to indicate that such Mortgage Loans have been assigned by the Seller to



the Depositor and by the Depositor to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance and the Class A-5 Insurer with this Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Seller further agrees that it will not, and will not permit the Company, any Servicer or the Master Servicer to, and the Master Servicer agrees that it will not, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement or the Mortgage Loan Purchase Agreement.

The Depositor shall not be required to deliver intervening assignments or Mortgage Note endorsements between the related Underlying Seller and the Seller, between the Seller and the Depositor, and between the Depositor and the Trustee; and provided, further, however, that in the case of Initial Mortgage Loans which have been prepaid in full after the Cut-off Date and prior to the Closing Date, the Depositor, in lieu of delivering the above documents, may deliver to the Trustee or the Custodian, as its agent, a certification to such effect and shall deposit all amounts paid in respect of such Mortgage Loans in the Master Servicer Collection Account on the Closing Date.

PSA: (POOLING AND SERVICING AGREEMENT)
http://www.sec.gov/Archives/edgar/data/1345749/000088237705003561/d400322_ex4-1.htm



# SECTION 3: FORECLOSURE
## Chain of Title and Chain of Note
### Recorded Events on the Loan Including Foreclosure Issues and Securitization

| | |
|---|---|
| AUGUST 19, 2005<br>Instrument #<br>05 1997819<br>Official Records,<br>LOS ANGELES COUNTY<br>CALIFORNIA | MAY SHAKTAH<br>(Borrower)<br><br>METROCITIES MORTGAGE, LLC<br>(Lender)<br>Loan #  21043552<br>MIN 1000342-0000254357-1 |
| MAY 02, 2012<br>Instrument #<br>20120650688<br>Official Records,<br>LOS ANGELES COUNTY<br>CALIFORNIA | NOTICE OF DEFAULT<br>ENTRA DEFAULT SOLUTIONS, LLC<br>SIGNED BY: JUNE CHRISTY<br>DATED: APRIL 30, 2012 |
| MAY 02, 2012<br>Instrument #<br>20120653445<br>Official Records,<br>LOS ANGELES COUNTY<br>CALIFORNIA | ASSIGNMENT OF DEED OF TRUST<br>MORTGAGE ELECTRONIC REGISTRATION<br>SYSTEMS, INC<br>SIGNED BY: JASON LAROCCA<br>DATED: MARCH 20, 2012 |

| | |
|---|---|
| AUGUST 17, 2005 | METROCITIES MORTGAGE, LLC<br>(Lender)<br><br>Principal Amount:<br>$1,000,000.00<br>Loan # 21043552 |
| NOVEMBER 1, 2005 | BEAR STEARNS ASSET BACKED<br>SECURITIES I TRUST 2005-AC9 |



# SECTION 4: REPORT SUMMARY

**Deed of Trust:**

- On AUGUST 17, 2005, Debtors MAY SHAKTAH executed a negotiable promissory note and a security interest in the form of a Deed of Trust in the amount of $1,000,000.00. This document was filed as document number 05 1997819 in the Official Records, LOS ANGELES COUNTY, CALIFORNIA. This document identifies the *loan number as 21043552*. The *original lender of the promissory note is METROCITIES MORTGAGE, LLC. Mortgage Electronic Registration Systems, Inc. (hereafter "MERS") is not named as the payee of the note, but is named as acting solely as a "nominee" for lender as the beneficiary of the security interest Deed of Trust. The original trustee under this Deed of Trust is FIDELITY NATIONAL LOAN PORTFOLIO SOLUTIONS.* Paragraph R of the Deed of Trust provides in part "This Security Instrument secures to Lender: (i) the repayment of the Loan..." Paragraph 20 of the Deed of Trust provides *"The Note or a partial interest in the Note (together with this Security Instrument)* can be sold one or more times without prior notice to Borrower.

- Paragraph 22 of the Deed of Trust : THE POWER OF SALE CLAUSE:

  If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.

**Notice of Default:**

- On MAY 02, 2012 Document number 20120650688 (Notice of Default and Election to Sell under Deed of Trust) was filed in the Official Records LOS ANGELES COUNTY, CALIFORNIA.

**Assignment of Deed of Trust:**

- An Assignment of deed of Trust was filed as document number 20120653445 in the Official Records, LOS ANGELES COUNTY, CALIFORNIA on MAY 02, 2012.



**Securitization:**

- The NOTE was sold, transferred and securitized into **BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2005-AC9.**

**MERS:**

- The Deed of Trust shows MIN 1000342-0000254357-1 and MERS SERVICER ID website https://www.mers-servicerid.org/sis indicates that MS9 is the Servicer and INV1 is the Investor.

- Although MERS records an assignment in the real property records, the promissory note which creates the legal obligation to repay the debt is not negotiated to MERS.

- MERS is never entitled to receive a borrower's monthly payments, nor is MERS ever entitled to receive the proceeds of a foreclosure or deed of trust sale.

- MERS is never the owner of the promissory note for which it seeks foreclosure.

- MERS has no legal or beneficial interest in the loan instrument underlying the security instrument for which it serves as "nominee"

- MERS has no legal or beneficial interest in the mortgage indebtedness underlying the security instrument for which it serves as "nominee".

- MERS has no interest at all in the promissory note evidencing the mortgage indebtedness.

- MERS is not a party to the alleged mortgage indebtedness underlying the security instrument for which it serves as "nominee".

- MERS has no financial or other interest in whether or not a mortgage loan is repaid.

- The CALIFORNIA Secretary of State Business Entity websites shows that MERS has an ACTIVE status for agent of process.



## MERS PROVIDES THE NEW SERVICER AND INVESTOR



### Process Loans, Not Paperwork™

**1 record matched your search:**

Need help? ❓

**MIN: 1000342-0000254357-1**     **Note Date: 08/17/2005**     **MIN Status: Inactive**

● **Investor for Individual Borrower**

> Your entries may be either upper or lower case.
>
> Fields marked ✱ are required.
>
> Last Name: SHAKTAH ✱
>
> SSN: ___ - __ - 7563 ✱
>
> ☑ By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer. ✱

● **Investor for Corporation/Non-Person Entity Borrower**

Servicer: CitiMortgage, Inc.     Phone: **(800) 283-7918**
O'Fallon, MO

Investor: **BSI Financial Services, Inc**



**SECURITIZATION FLOW CHART**
**CHAIN OF TITLE**



The creation of MERS changed the lending process. Instead of the lender being the Beneficiary on the Deed of Trust, MERS was now named as either the "Beneficiary" or the "Nominee for the Beneficiary" on the Deed of Trust. The concept was that with MERS assuming this role, there would be no need for Assignments of the Deed of Trust, since MERS would be given the "power of sale" through the Deed of Trust.

The naming of MERS as the Beneficiary meant that certain other procedures had to change. This was a result of the Note actually being made out to the lender, and not to MERS. Before explaining this change, it would be wise to explain the Securitization process.

As mentioned previously, Securitization and MERS required many changes in established practices. These practices were not and have not been codified, so they are major points of contention today.

One of the first issues to be addressed was how MERS might foreclose on a property. This was "solved" through an "unusual" practice.

- MERS has only 44 employees. They are all "overhead", administrative or legal personnel. How could they handle the load of foreclosures, Assignments, etc to be expected of a company with their duties and obligations?  When a lender, title company, foreclosure company or other firm signed up to become a member of MERS, one or more of their people were designated as "Corporate Officers" of MERS and given the title of either Assistant Secretary or Vice President. These personnel were not employed by MERS, nor received income from MERS. They were been named "Officers" solely for the purpose of signing foreclosure and other legal documents in the name of MERS. (Apparently, there are some agreements which "authorize" these people to act in an Agency manner for MERS.)

This "solved" the issue of not having enough personnel to conduct necessary actions. It would be the Servicers, Trustees and Title Companies conducting the day-to-day operations needed for MERS to function.

As well, it was thought that this would provide MERS and their "Corporate Officers" with the "legal standing" to foreclose.

However, this brought up another issue that now needed addressing:

- When a Note is transferred, it must be endorsed and signed, in the manner of a person signing his paycheck over to another party. Customary procedure was to endorse it as "Pay to the Order of" and the name of the party taking the Note and then signed by the endorsing party. With a new party holding the Note, there would now need to be an Assignment of the Debt. This could not work if MERS was to be the foreclosing party.

The promissory note was made payable to METROCITIES MORTGAGE, LLC.  No record document suggests that it has been indorsed to MERS or any other named entity



Once a name is placed into the endorsement of the Note, then that person has the beneficial interest in the Note. Any attempt by MERS to foreclose in the MERS name would result in a challenge to the foreclosure since the Note was owned by "ABC" and MERS was the "Beneficiary". MERS would not have the legal standing to foreclose, since only the "person of interest" would have such authority. So, it was decided that the Note would be endorsed "in blank", which effectively made the Note a "Bearer Bond", and anyone holding the Note would have the "legal standing" to enforce the Note under Uniform Commercial Code. This would also suggest that Assignments would not be necessary.

MERS has recognized the Note Endorsement problem and on their website, stated that they could be the foreclosing party only if the Note was endorsed in blank. If it was endorsed to another party, then that party would be the foreclosing party.

As a result, most Notes are endorsed in blank, which purportedly allows MERS to be the foreclosing party. However, CA Civil Code 2932.5 has a completely different say in the matter. It requires that the Assignment of the Debt be executed.

- *CA Civil Code 2932.5 – Assignment* "*Where a power to sell real property is given to a mortgagee, or other encumbrancer, in an instrument intended to secure the payment of money, the power is part of the security and vests in any person who by assignment becomes entitled to payment of the money secured by the instrument. The power of sale may be exercised by the assignee if the assignment is duly acknowledged and recorded.*"

As is readily apparent, the above statute would suggest that Assignment is a requirement for enforcing foreclosure.

The question now becomes as to whether a Note Endorsed in Blank and transferred to different entities as indicated previously does allow for foreclosure. If MERS is the foreclosing authority but has no entitlement to payment of the money, how could they foreclose? *This is especially true if the true beneficiary is not known. Why raise the question of who the true beneficiary is? Again, from the MERS website........*

- "On MERS loans, MERS will show as the beneficiary of record. Foreclosures should be commenced in the name of MERS. To effectuate this process, MERS has allowed each servicer to choose a select number of its own employees to act as officers for MERS. Through this process, appropriate documents may be executed at the servicer's site on behalf of MERS by the same servicing employee that signs foreclosure documents for non-MERS loans. Until the time of sale, the foreclosure is handled in same manner as non-MERS foreclosures. At the time of sale, if property reverts, the Trustee's Deed Upon Sale will follow a different procedure. Since MERS acts as nominee for the true beneficiary, it is important that the Trustee's Deed Upon Sale be made in the name of the true beneficiary and not MERS. *Your title company or MERS officer can easily determine the true beneficiary.* Title companies have indicated that they will insure subsequent title when these procedures are followed."



There, you have it. Direct from the MERS website. They admit that they name people to sign documents in the name of MERS. Often, these are Title Company employees or others that have no knowledge of the actual loan and whether it is in default or not.

Even worse, MERS admits that they are not the true beneficiary of the loan. In fact, it is likely that MERS has no knowledge of the true beneficiary of the loan for whom they are representing in an "Agency" relationship. They admit to this when they say "*Your title company or MERS officer can easily determine the true beneficiary.*

To further reinforce that MERS is not the true beneficiary of the loan, one need only look at the following Nevada Bankruptcy case, Hawkins, Case No. BK-S-07-13593-LBR (Bankr.Nev. 3/31/2009) (Bankr.Nev., 2009) – "**A "beneficiary" is defined as "one designated to benefit from an appointment, disposition, or assignment . . . or to receive something as a result of a legal arrangement or instrument." BLACK'S LAW DICTIONARY 165 (8th ed. 2004). But it is obvious from the MERS' "Terms and Conditions" that MERS is not a beneficiary as it has no rights whatsoever to any payments, to any servicing rights, or to any of the properties secured by the loans. To reverse an old adage, if it doesn't walk like a duck, talk like a duck, and quack like a duck, then it's not a duck."**

In the case of MERS, the Note and the Deed of Trust are held by separate entities. This can pose a unique problem dependent upon the court. There are many court rulings based upon the following:

**"The Deed of Trust is a mere incident of the debt it secures and an assignment of the debt carries with it the security instrument. Therefore, a Deed Of Trust is inseparable from the debt and always abides with the debt. It has no market or ascertainable value apart from the obligation it secures.**

**A Deed of Trust has no assignable quality independent of the debt, it may not be assigned or transferred apart from the debt, and an attempt to assign the Deed of Trust without a transfer of the debt is without effect. "**

This very "simple" statement poses major issues. *To easily understand, if the Deed of Trust and the Note are not together with the same entity, then there can be no enforcement of the Note. The Deed of Trust enforces the Note. It provides the capability for the lender to foreclose on a property. If the Deed is separate from the Note, then enforcement, i.e. foreclosure cannot occur.* The following ruling summarizes this nicely.

In *Saxon vs Hillery, CA, Dec 2008, Contra Costa County Superior Court,* an action by Saxon to foreclose on a property by lawsuit was dismissed due to lack of legal standing. This was because the Note and the Deed of Trust were "owned" by separate entities. The Court ruled that when the Note and Deed of Trust were separated, the enforceability of the Note was negated until rejoined.

The mortgage securing the note, while naming METROCITIES MORTGAGE, LLC as "Lender," separately names the Mortgage Electronic Registration Systems, Inc. (MERS) as the "Mortgagee." The conveyancing language granted the mortgage to MERS "solely as nominee for Lender and Lender's successor's and assigns."



METROCITIES MORTGAGE, LLC was a "correspondent lender" that originated mortgage loans which in turn, was sold and transferred into a "federally-approved securitization" trust named BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2005-AC9.

- The Note and Deed have taken two distinctly different paths. The Note was securitized into BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2005-AC9.

- The written agreement that created the BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2005-AC9 is a "Pooling and Servicing Agreement" (PSA), and is a matter of public record, available on the website of the Securities Exchange Commission. The Trust is also described in a "Prospectus Supplement," also available on the SEC website. The Trust by its terms set a "CLOSING DATE" of ON OR ABOUT NOVEMBER 30, 2005. The promissory note in this case became trust property in compliance with the requirement set forth in the PSA. The Trust agreement is filed under oath with the Securities and Exchange Commission. The acquisition of the assets of the subject Trust and the PSA are governed under the law.

*In view of the foregoing, all Assignment of Deed of Trust executed after the Trust's Closing Date would be a void act for the reason that it violated the express terms of the Trust instrument.*

- The loan was originally made to METROCITIES MORTGAGE, LLC and was sold and transferred to BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2005-AC9. There is no record of Assignments to either the Sponsor or Depositor as required by the Pooling and Servicing Agreement.

In *Carpenter v. Longan* 16 Wall. 271,83 U.S. 271, 274, 21 L.Ed. 313 (1872), *the U.S. Supreme Court stated "The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while assignment of the latter alone is a nullity."*

An obligation can exist with or without security. With no security, the obligation is unsecured but still valid. A security interest, however, cannot exist without an underlying existing obligation. It is impossible to define security apart from its relationship to the promise or obligation it secures. (Civil Code §§ 2872, 2909, 2920; California Mortgages and Deeds of Trust, and Foreclosure Litigation, by Roger Bernhardt, Fourth Edition, § 1.11) The obligation and the security are commonly drafted as separate documents – typically a promissory note and a deed of trust. If the creditor transfers the note but not the deed of trust, the transferee receives a secured note; the security follows the note, legally if not physically. If the transferee is given the deed of trust without the note accompanying it, the transferee has no meaningful rights except the possibility of legal action to compel the transferor to transfer the note as well, if such was the agreement. (Kelley v. Upshaw 91952) 39 C.2d 179, 246 P.2d 23; Polhemus v. Trainer (1866) 30C 685)

"Where the mortgagee has "transferred" only the mortgage, the transaction is a nullity and his "assignee" having received no interest in the underlying debt or obligation, has a worthless piece of paper (4 Richard R. Powell), Powell on Real Property, § 37.27 [2] (2000)



By statute, assignment of the mortgage carries with it the assignment of the debt. . .  Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable. *The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose,* unless holder of the deed of trust is the agent of the holder of the note. Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. *The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust.*"

**ANY ATTEMPT TO TRANSFER THE BENEFICIAL INTEREST OF A TRUST DEED WITHOUT OWNERSHIP OF THE UNDERLYING NOTE IS VOID UNDER CALIFORNIA LAW**



# AFFIDAVIT

**STATE OF CALIFORNIA** )
)
**COUNTY OF LOS ANGELES** )

I, Arthur Bernardo, a citizen of the United States and the State of California over the age of 21 years, and declares as follows, under penalty of perjury that the facts stated herein are true, correct and complete.   The undersigned believes them to be true and admissible as evidence in a court of law, and if called upon as a witness, will testify as stated herein:

1. I am a Certified Mortgage Securitization Auditor and my qualifications, expertise and experience provide me with the background necessary to certify the audit services and to be qualified as an expert in this field. I have produced thousands of Securitized Analysis Reports in residential real estate mortgage investigations and have trained auditors in California, Chicago, Nevada and Florida.

2. I have the trained skills and qualifications to navigate and perform searches on the Bloomberg terminal in regards to the automatic tracking and determination of mortgage loans and the subsequent loan-related documents and information.

3. The contents of this report are factual, but it is provided for information purposes only and is not to be construed as "legal advice."[1]

4. On May 17, 2012, I researched the County Records online Database at the request of MAY SHAKTAH whose property address is 4407 ALTA TUPELO DRIVE, CALABASAS, CA 91302.

5. Based on the information I was provided, MAY SHAKTAH signed a Promissory Note in favor of METROCITIES MORTGAGE, LLC on AUGUST 17, 2005 with the **Loan Number 21043552** and MERS IDENTIFICATION NUMBER 1000342-0000254357-1 (MIN).

6. MIN Number 1000342-0000254357-1 was identified in BEAR STEARNS ASSET BACKED SECURITIES I TRUST 2005-AC9 with the Master Servicer being WELLS FARGO BANK, NATIONAL ASSOCIATION, the Sponsor / Seller being EMC

---

[1] The client has been strongly advised to seek legal consultation from a competent legal professional in connection with the content of this report and how to properly use it



MORTGAGE CORPORATION and the Depositor being BEAR STEARNS ASSET BACKED SECURITIES I LLC

7.  Generally, if the Deed of Trust and the Note are not together with the same entity, there can be no legal enforcement of the Note.   The deed of trust enforces the Note and provides the capability for the lender to foreclose on the property.   Thus, if the Deed of Trust and the Note are separated and has different mortgagee / beneficiary, foreclosure cannot legally occur.

8.  No Entity can be a CREDITOR if they do not hold/own the asset in question (i.e. the NOTE and/or the property); a Mortgage Pass Through Trust (i.e. R.E.M.I.C., as defined in Title 26, Subtitle A, Chapter 1, Subchapter M, Part II §§ 850-862) cannot hold assets, for if they do, their tax exempt status is violated and the Trust itself is void *ab initio*. Therefore, either the Trust has either voided its intended Tax Free Status, or the asset is not in fact owned by it.

Careful review and examination reveals that this was a securitized loan. The Assignment of Mortgage pretended to be an A to D transaction when in fact the foreclosing party was hiding the A to B, B to C, and C to D facts of true sales. They also hid the legal SEC filings, governing the transaction according to our findings. But to be controlled by those SEC filings, the true original loan Note and Mortgage had to be provided by the Document Custodian certified to have been in possession of them by the on or about ON OR ABOUT NOVEMBER 30, 2005. Because it was not, the claim of ownership by the Trust cannot be substantiated and the loan servicing rights not established at law by agreement.

By: _Arthur Bernardo_
_____
**ARTHUR BERNARDO**
**Certified Mortgage Securitization Auditor**

# EXHIBIT D



TERMS AND CONDITIONS

1.  MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request.   The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party.  The Member shall be bound by any amendment to any of the Governing Documents.

2.  The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System.  MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time.  MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans.  MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties.  References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law.

3.  MERS shall at all times comply with the instructions of the holder of mortgage loan promissory notes.  In the absence of contrary instructions from the note holder, MERS shall comply with instructions from the Servicer shown on the MERS® System in accordance with the Rules and Procedures of MERS.

4.  No rights or obligations of the Member with respect to any data or information supplied to MERS by or on behalf of the Member shall be altered or affected in any manner by the provision of such data or information to MERS (except as otherwise specifically provided in these Terms and Conditions or the Rules of Membership).

5.  If the Member uses MERS as Original Mortgagee (MOM) on the security instrument, the loan must be registered on the MERS® System within 10 days of the Note Date.

6.  MERS and the Member agree that:  (i) the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans, (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, and (iii) membership in MERS or use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System.

7.  If the Member has a third-party register loans (the "Registrar") on the MERS® System on behalf of the Member, the Registrar shall not be deemed an agent of MERS.  The Registrar shall be solely an agent for the Member, and MERS is only giving consent to the Member to use a Registrar to enter information on the MERS® System on behalf of the Member.  The Member agrees that MERS is not liable to the Member for any errors and omissions, negligence, breach of confidentiality, breach of the Rules and Procedures, or willful misconduct of the Registrar, or any employee, director, officer, agent or affiliate of the Registrar in performing its services to the Member.

8.  The Member shall promptly pay to MERS the compensation due it for transactions registered on the MERS® System and other services rendered to the Member based on the then current MERS fee schedules, which may change from time to time.  The Member shall promptly pay to MERS any interest and penalties on delinquent fee payments at the rate set by MERS from time to time.  MERS shall have the authority to impose reasonable penalties and fines on Members for breach of the Governing Documents, and the Member shall promptly pay such fines in accordance with the terms of their imposition.

9.  MERS shall indemnify and hold harmless the Member, and any employee, director, officer, agent or affiliate of the Member  ("Member Party"), from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses ("Indemnified Payments") that the Member Party may sustain directly from the negligence, errors and omissions, breach of confidentiality, breach of the Terms and Conditions, breach of the Rules and Procedures, or willful misconduct of MERS, or any employee, director, officer, agent or affiliate of MERS ("MERS Indemnified Claim").  Notwithstanding the foregoing, MERS shall not be liable or responsible under the terms of this Paragraph for any losses or claims

resulting from the actions or omissions of any person other than an employee, director, officer (who is also an employee of MERS), agent or affiliate of MERS.

The Member shall indemnify and hold harmless MERS, and any employee, director, officer, agent or affiliate of MERS ("MERS Party"), for any Indemnified Payments which do not result from a MERS Indemnified Claim and which such MERS Party incurs (i) from the negligence, errors and omissions, breach of confidentiality, breach of the Terms and Conditions, Rules and Procedures, or willful misconduct of a Member Party, (ii) with respect to a transaction on the MERS® System initiated by such Member, or (iii) as a result of compliance by MERS with instructions given by the Member, or its designee, as beneficial owner, servicer or secured party shown on the MERS® System ("Member Indemnified Claim").

MERS shall promptly notify the Member if a claim is made by a third party against either MERS or the Member with respect to any mortgage loan registered on the MERS® System in which the Member is shown on the MERS® System as beneficial owner, servicer or secured party in accordance with the Rules and Procedures. The Member shall promptly notify MERS if a claim is made against the Member that may be subject to the indemnification provisions of this Paragraph.

The obligations of MERS and the Member under this Paragraph shall survive the termination of the Member's use of the MERS® System.

10. MERS and the Member shall maintain appropriate insurance coverage that shall include an errors and omissions insurance policy and a fidelity bond. MERS shall not be required to maintain coverage for persons who may be appointed at the request of the Member as certifying officers of MERS. The Member's policies shall protect and insure MERS against losses in connection with the release or satisfaction of a mortgage loan without having obtained payment in full of the indebtedness secured thereby. Upon request, MERS or the Member shall cause to be delivered to the other a certified true copy of such errors and omissions insurance policy and fidelity bond.

In the event of any loss of principal or interest on a mortgage loan or any Indemnified Payments for which reimbursement is received from a fidelity bond or any errors and omissions insurance policy or other insurance policy, the proceeds from any such bond or insurance shall be held in trust for and be promptly paid to the Member who is shown as the servicer on the MERS® System on behalf of the beneficial owner unless otherwise requested by the beneficial owner.

11. Any notice or other communication which is required or permitted to be given or made to MERS pursuant to any provision of the Governing Documents shall be given or made in writing and shall be sent by nationally recognized overnight courier, or facsimile followed by delivery of the original via first class mail, addressed as follows: MERS, Corporate Secretary, 1818 Library Street, Suite 300, Reston, Virginia, 20190.

12. These Terms and Conditions and all transactions effected by the Member with MERS shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

13. Neither the Member nor MERS shall institute a proceeding before any tribunal to resolve any controversy or claim arising out of or relating to these Terms and Conditions, Rules and Procedures, or the breach, termination or invalidity thereof (a "Dispute"), before such party has sought to resolve the Dispute through direct negotiation with the other party. If the Dispute is not resolved within thirty (30) days after a written demand for direct negotiation, the parties shall attempt to resolve the Dispute through mediation. If the parties do not promptly agree on a mediator, either party may request the then chief judge of the Circuit Court of Fairfax County, Virginia to appoint a mediator. All mediation proceedings hereunder shall be held in Washington, D.C. If the mediator is unable to facilitate a settlement of the Dispute within a reasonable period of time, as determined by the mediator, the mediator shall issue a written statement to the parties to that effect and the aggrieved party may then seek relief in accordance with the arbitration provisions of this Paragraph. The fees and expenses of the mediator shall be paid by the party initiating the Dispute.

In the event that the Member and MERS are not able to resolve a Dispute in accordance with the mediation provisions of this Paragraph, such Dispute shall be settled by binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof; provided, however, that the place of arbitration shall be Washington, DC, and fees and expenses for the arbitration proceedings shall be paid by the party initiating arbitration.

# EXIHIBIT E

Exhibit "C"

**Jason LaRocca**

**Derivatives Support at JP Morgan Asset Management**

Greater New York City Area | Financial Services

| | |
|---|---|
| Current | **Derivatives Support at JP Morgan Asset Management** |
| Past | Transaction Processing Specialist at JP Morgan Chase |
| | Intern at Lincoln Financial Advisors |
| Education | Temple University |
| Connections | 133 connections |
| Public Profile | http://www.linkedin.com/in/jasonlarocca |

| Share | PDF | Print |
|---|---|---|

## Experience

### Derivatives Support

**JP Morgan Asset Management**

Financial Services industry

May 2010 – Present (2 years 3 months) | Greater New York City Area

• Process collateral to cover margin requirements for future and OTC products.
• Evaluate collateral requests by calculating margin requirements for equity index futures and fixed income contracts
• Resolve outstanding breaks with brokers and custodians due to interest on collateral, account system errors, and other processing errors
• Liaising with the front office, custodians, clearing broker, and other internal teams to ensure all trades settle in accordance with DTC.
• Develop a collateral system by coordinating with computer programmers, internal teams, and PMs to increase control, reporting, and efficiency
• Provide support for all departmentally supported products such as futures, OTC, equity options, and Prime Brokerage equities.

# EXHIBIT F

# Interagency Review of Foreclosure Policies and Practices

Federal Reserve System

Office of the Comptroller of the Currency

Office of Thrift Supervision

  

WASHINGTON, D.C.   •   APRIL 2011

# Interagency Review of Foreclosure Policies and Practices

Federal Reserve System

Office of the Comptroller of the Currency

Office of Thrift Supervision

  

WASHINGTON, D.C.   •   APRIL 2011

# Contents

Executive Summary ............................................................................................ 1
   Review Scope and Objectives ..................................................................... 1
   Summary of Review Findings ...................................................................... 2
   Summary of Supervisory Response ............................................................ 4

Part 1: Background and Risks Associated
with Weak Foreclosure Process and Controls ................................................ 5
   Impact on Borrowers .................................................................................. 5
   Impact on the Industry and Investors ......................................................... 6
   Impact on the Judicial Process ................................................................... 6
   Impact on the Mortgage Market and Communities ..................................... 6

Part 2: Review Findings ................................................................................... 7
   Foreclosure Process Governance ............................................................... 7
   Organizational Structure and Availability of Staffing ................................... 8
   Affidavit and Notarization Practices ........................................................... 8
   Documentation Practices ........................................................................... 8
   Third-party Vendor Management ................................................................ 9
      Arrangements with Outside Law Firms ................................................. 9
      Arrangements with Default Management Service Providers (DMSPs) ..... 10
      Arrangements with Mortgage Electronic Registration Systems, Inc. ....... 10
   Ineffective Quality Control (QC) and Audit ................................................ 11

Part 3: Supervisory Response ........................................................................ 13

Part 4: Industry Reforms ................................................................................ 15
   Governance and Oversight ....................................................................... 15
   Organizational Structure, Staffing, and Technology .................................. 15
   Accountability and Responsiveness Dealing with Consumers ................... 15

# Executive Summary

The Federal Reserve System, the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated mortgage servicers during the fourth quarter of 2010.[1]

This report provides a summary of the review findings and an overview of the potential impacts associated with instances of foreclosure-processing weaknesses that occurred industrywide. In addition, this report discusses the supervisory response made public simultaneous with the issuance of this report, as well as expectations going forward to address the cited deficiencies. The supervisory measures employed by the agencies are intended to ensure safe and sound mortgage-servicing and foreclosure-processing business practices are implemented. The report also provides an overview of how national standards for mortgage servicing can help address specific industrywide weaknesses identified during these reviews.

## Review Scope and Objectives

The primary objective of each review was to evaluate the adequacy of controls and governance over servicers' foreclosure processes and assess servicers' authority to foreclose. The reviews focused on issues related to foreclosure-processing functions. While the reviews uncovered significant problems in foreclosure processing at the servicers included in the report, examiners reviewed a relatively small number of files from among the volumes of foreclosures processed by the servicers. Therefore, the reviews could not provide a reliable estimate of the number of foreclosures that should not have proceeded. The agencies, therefore, are requiring each servicer to retain an independent firm to conduct a thorough review of foreclosure actions that were pending at any time from January 1, 2009, through December 31, 2010, to, among other things, 1) identify borrowers that have been financially harmed by deficiencies identified in the independent review and 2) provide remediation to those borrowers where appropriate. These independent reviews will be subject to supervisory oversight to ensure that the reviews are comprehensive and the results are reliable.

For the reviews discussed in this report, examiners evaluated each servicer's self-assessments of their foreclosure policies and processes; assessed each servicer's foreclosure operating procedures and controls; interviewed servicer staff involved in the preparation of foreclosure documents; and reviewed, collectively for all servicers, approximately 2,800 borrower foreclosure files that were in various stages of the foreclosure process between January 1, 2009, and December 31, 2010.[2]

Examiners focused on foreclosure policies and procedures; quality control and audits; organizational structure and staffing; and vendor management,

---

[1] Agencies conducted foreclosure-processing reviews at Ally Bank/GMAC, Aurora Bank, Bank of America, Citibank, EverBank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo. The reviews included mortgage-servicing activities conducted by insured banks and thrifts, as well as by several nonbank affiliates of these organizations. The 14 servicers were selected based on the concentration of their mortgage-servicing and foreclosure-processing activities. The agencies typically do not disclose examinations or examination findings regarding particular institutions. In light of the formal enforcement actions entered into by these 14 servicers, which are being made public, the agencies have determined that it is appropriate to identify the servicers (whether a bank or a bank affiliate) that were reviewed. The bank and thrift holding company parents of Ally Bank/GMAC, Bank of America, Citibank, Everbank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, SunTrust, U.S. Bank, and Wells Fargo also entered into formal enforcement actions.

[2] Foreclosure files at each servicer were selected from the population of in-process and completed foreclosures during 2010. The foreclosure file sample at each servicer included foreclosures from both judicial states and nonjudicial states. Review teams independently selected foreclosure file samples based on pre-established criteria (such as files for which consumer complaints had been raised, or those in geographic areas with high volumes of foreclosures) with the balance of the files selected based on examiner judgment.

including use of third-party vendors such as foreclosure attorneys, Lender Processing Services (LPS) and other default-service providers, and MERSCORP and its wholly owned subsidiary, Mortgage Electronic Registration Systems, Inc. (MERS). Based on their reviews of the limited number of foreclosure-file samples, examiners also assessed the accuracy of foreclosure-related documentation, including note endorsements and the assignments of mortgages and deeds of trust, and loan document control.[3] With respect to those files, examiners also assessed whether fees charged in connection with the foreclosures exceeded the amounts reflected in the servicers' internal records. In addition, the Federal Reserve and the OCC solicited views from consumer groups to help detect problems at specific servicers, and the Federal Reserve expanded the file sample to include borrowers who were delinquent, but not yet in foreclosure.

The file reviews did not include a complete analysis of the payment history of each loan prior to foreclosure or potential mortgage-servicing issues outside of the foreclosure process. Accordingly, examiners may not have uncovered cases of misapplied payments or unreasonable fees, particularly when these actions occurred prior to the default that led to the foreclosure action. The foreclosure-file reviews also may not have uncovered certain facts related to the processing of a foreclosure that would lead an examiner to conclude that a foreclosure otherwise should not have proceeded, such as undocumented communications between a servicer employee and the borrower in which the employee told the borrower he or she had to be delinquent on the loan to qualify for a modification. In addition, the reviews did not focus on loan-modification processes, but when reviewing individual foreclosure files, examiners checked for evidence that servicers were in contact with borrowers and had considered alternative loss-mitigation efforts, including loan modifications.

To ensure consistency in the reviews, the agencies used standardized work programs to guide the assessment and to document findings pertaining to each servicer's corporate governance process and the individual foreclosure-file reviews. The work programs were organized into the following categories:

- **Policies and procedures.** Examiners reviewed the servicers' policies and procedures to see if they provided adequate controls over the foreclosure process and whether those policies and procedures were sufficient for compliance with applicable laws and regulations.

- **Organizational structure and staffing.** Examiners reviewed the functional unit(s) responsible for foreclosure processes, including their staffing levels, their staff's qualifications, and their training programs.

- **Management of third-party service providers.** Examiners reviewed the servicers' oversight of key third parties used throughout the foreclosure process, with a focus on foreclosure attorneys, MERS, and default-service providers such as LPS.

- **Quality control and internal audits.** Examiners assessed quality-control processes in foreclosures. Examiners also reviewed internal and external audit reports, including government-sponsored enterprise (GSE) and investor audits and reviews of foreclosure activities as well as servicers' self-assessments.

- **Compliance with applicable laws.** Examiners checked the adequacy of the governance, audits, and controls that servicers had in place to ensure compliance with applicable laws.

- **Loss mitigation.** Examiners determined if servicers were in direct communication with borrowers and whether loss-mitigation actions, including loan modifications, were considered as alternatives to foreclosure.

- **Critical documents.** Examiners evaluated servicers' control over critical documents in the foreclosure process, including the safeguarding of original loan documentation. Examiners also determined whether critical foreclosure documents were in the foreclosure files that they reviewed, and whether notes were endorsed and mortgages assigned.

- **Risk management.** Examiners assessed whether servicers appropriately identified financial, reputational, and legal risks and whether these risks were communicated to the board of directors and senior management of the servicer.

## Summary of Review Findings

The reviews found critical weaknesses in servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys. While it is important to note that findings

---

[3]  For purposes of this report, default management services generally include administrative support and services provided to the servicers by third-party vendors to manage and perform the tasks associated with foreclosures.

varied across institutions, the weaknesses at each servicer, individually or collectively, resulted in unsafe and unsound practices and violations of applicable federal and state law and requirements.[4] The results elevated the agencies' concern that widespread risks may be presented—to consumers, communities, various market participants, and the overall mortgage market. The servicers included in this review represent more than two-thirds of the servicing market. Thus, the agencies consider problems cited within this report to have widespread consequences for the national housing market and borrowers.

Based on the deficiencies identified in these reviews and the risks of additional issues as a result of weak controls and processes, the agencies at this time are taking formal enforcement actions against each of the 14 servicers subject to this review to address those weaknesses and risks. The enforcement actions require each servicer, among other things, to conduct a more complete review of certain aspects of foreclosure actions that occurred between January 1, 2009, and December 31, 2010. The specific supervisory responses are summarized in Part 3 of this report.

The loan-file reviews showed that borrowers subject to foreclosure in the reviewed files were seriously delinquent on their loans. As previously stated, the reviews conducted by the agencies should not be viewed as an analysis of the entire lifecycle of the borrowers' loans or potential mortgage-servicing issues outside of the foreclosure process. The reviews also showed that servicers possessed original notes and mortgages and, therefore, had sufficient documentation available to demonstrate authority to foreclose. Further, examiners found evidence that servicers generally attempted to contact distressed borrowers prior to initiating the foreclosure process to pursue loss-mitigation alternatives, including loan modifications. However, examiners did note cases in which foreclosures should not have proceeded due to an intervening event or condition, such as the borrower (a) was covered by the Servicemembers Civil Relief Act, (b) filed for bankruptcy shortly before the foreclosure action, or (c) qualified for or was paying in accordance with a trial modification.[5]

The interagency reviews identified significant weaknesses in several areas.

---

[4] This report captures only the significant issues found across the servicers reviewed, not necessarily findings at each servicer.

[5] Servicemembers Civil Relief Act, 50 USC App. sections. 501–596, Public Law 108-189.

- **Foreclosure process governance.** Foreclosure governance processes of the servicers were underdeveloped and insufficient to manage and control operational, compliance, legal, and reputational risk associated with an increasing volume of foreclosures. Weaknesses included:

  - inadequate policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process;

  - inadequate monitoring and controls to oversee foreclosure activities conducted on behalf of servicers by external law firms or other third-party vendors;

  - lack of sufficient audit trails to show how information set out in the affidavits (amount of indebtedness, fees, penalties, etc.) was linked to the servicers' internal records at the time the affidavits were executed;

  - inadequate quality control and audit reviews to ensure compliance with legal requirements, policies and procedures, as well as the maintenance of sound operating environments; and

  - inadequate identification of financial, reputational, and legal risks, and absence of internal communication about those risks among boards of directors and senior management.

- **Organizational structure and availability of staffing.** Examiners found inadequate organization and staffing of foreclosure units to address the increased volumes of foreclosures.

- **Affidavit and notarization practices.** Individuals who signed foreclosure affidavits often did not personally check the documents for accuracy or possess the level of knowledge of the information that they attested to in those affidavits. In addition, some foreclosure documents indicated they were executed under oath, when no oath was administered. Examiners also found that the majority of the servicers had improper notary practices which failed to conform to state legal requirements. These determinations were based primarily on servicers' self-assessments of their foreclosure processes and examiners' interviews of servicer staff involved in the preparation of foreclosure documents.

- **Documentation practices.** Examiners found some—but not widespread—errors between actual fees charged and what the servicers' internal records indicated, with servicers undercharging fees as frequently as overcharging them. The dollar amount

of overcharged fees as compared with the servicers' internal records was generally small.

- **Third-party vendor management.** Examiners generally found adequate evidence of physical control and possession of original notes and mortgages. Examiners also found, with limited exceptions, that notes appeared to be properly endorsed and mortgages and deeds of trust appeared properly assigned.[6] The review did find that, in some cases, the third-party law firms hired by the servicers were nonetheless filing mortgage foreclosure complaints or lost-note affidavits even though proper documentation existed.

- **Quality control (QC) and audit.** Examiners found weaknesses in quality control and internal auditing procedures at all servicers included in the review.

## Summary of Supervisory Response

The agencies recognize that a number of supervisory actions and industry reforms are required to address these weaknesses in a way that will hold servicers accountable for establishing necessary governance and controls. Measures that the servicers are being required to implement are designed to ensure compliance with applicable laws, promote foreclosure processing in a safe and sound manner, and establish responsible business practices that provide accountability and appropriate treatment to borrowers.

---

[6] The agencies expect federally regulated servicers to have the necessary policies and procedures in place to ensure that notes are properly endorsed and mortgages are properly assigned, so that ownership can be determined at the time of foreclosure. Where federally regulated servicers serve as document custodians for themselves or other investors, the agencies require controls and tracking systems to properly safeguard the physical security and maintenance of critical loan documents.

At this time, the agencies are taking formal enforcement action against each of the 14 servicers and parent bank holding companies because the deficiencies and weaknesses identified during the reviews represent unsafe or unsound practices and violations of applicable law. The foreclosure-file reviews showed that borrowers in the sampled pool were seriously delinquent. The reviews also showed that the appropriate party brought the foreclosure action. However, a limited number of mortgages should not have proceeded to foreclosure because of an intervening event or condition. Nevertheless, the weaknesses in servicers' foreclosure processes, as confirmed by the reviews, present significant risk to the safety and soundness of mortgage activities. The failures and deficiencies identified as part of the reviews must be remedied swiftly and comprehensively.

The agencies will continue to assess and monitor corrective actions and will address servicers' failures to correct identified deficiencies where necessary.

Going forward, servicers must develop and demonstrate effective risk management of servicing operations to prevent a recurrence of deficiencies cited in this report. The agencies are currently engaged in an effort to establish national mortgage-servicing standards to promote the safe and sound operation of mortgage-servicing and foreclosure processing, including standards for accountability and responsiveness to borrower concerns. Such an effort will include engaging the Government Sponsored Enterprises, private investors, consumer groups, the servicing industry, and other regulators. Part 4 of this report provides a general overview of the core principles that should be included in future national mortgage-servicing standards.

# Part 1: Background and Risks Associated with Weak Foreclosure Process and Controls

Mortgage servicing plays a central role in the management of mortgage loans from origination to final disposition. The mortgage servicer is the intermediary between borrowers and their lenders. When the borrower is paying as agreed, the servicer's duties are ministerial: collecting payments, distributing payments to investors, managing cash and administering funds in escrow, and reporting to investors. When a loan is in default, the demands on the servicer necessarily expand, requiring additional resources and much more sophisticated risk management. A necessary consequence of the growth in foreclosures since 2007 is increased demands on servicers' foreclosure processes.

The residential mortgage-servicing market is highly concentrated among a few servicers. The five largest mortgage servicers by activity volume—included among the 14 servicers subject to the reviews addressed in this report—account for 60 percent of the industry's total servicing volume.[7] The 14 servicers included in the interagency review collectively represent more than two-thirds of the servicing industry (see **figure 1**), or nearly 36.7 million mortgages.[8]

At the end of the fourth quarter of 2010, nearly 54 million first-lien mortgage loans were outstanding, 2.4 million of which were at some point in the foreclosure process. Additionally, two million mortgages were 90 or more days past due and at an elevated risk of foreclosure. New foreclosures are on pace to approach 2.5 million by the end of 2011. In light of the number of foreclosures and continued weakness in overall mortgage performance, the agencies are concerned that the deficiencies in foreclosure



Figure 1. Concentration of the mortgage-servicing Industry

- 14 examined servicers
- All other servicers

Source: Federal Reserve staff estimates of the concentration of servicing volume, based on data from Inside Mortgage Finance.

processing observed among these major servicers may have widespread consequences for the housing market and borrowers.

## Impact on Borrowers

Weaknesses in foreclosure processes and controls present the risk of foreclosing with inaccurate documentation, or foreclosing when another intervening circumstance should intercede. Even if a foreclosure action can be completed properly, deficiencies can result (and have resulted) in violations of state foreclosure laws designed to protect consumers. Such weaknesses may also result in inaccurate fees and charges assessed against the borrower or property, which may make it more difficult for borrowers to bring their loans current. In addition, borrowers can find their loss-mitigation options curtailed because of dual-track processes that result in foreclosures even when a borrower has been approved for a loan modification. The risks presented by weaknesses in foreclosure processes are more acute when those processes are aimed at speed and quantity instead of quality and accuracy.

---

[7]  The five largest mortgage servicers in order are Bank of America, Wells Fargo, JPMorgan Chase, Citibank, and Ally Bank/GMAC.

[8]  Federal Reserve staff estimates 54 million first-lien mortgages outstanding as of December 31, 2010.

## Impact on the Industry and Investors

Weaknesses in foreclosure processes pose a variety of risks to the financial services industry and investors. These risks extend beyond the financial cost of remedying procedural errors and re-filing affidavits and other foreclosure documents. Servicers may also bear legal costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations. Servicers may be subject to claims by investors as a result of delays or other damages caused by the weaknesses. Furthermore, concerns about the prevalence of irregularities in the documentation of ownership may cause uncertainty for investors of securitized mortgages. Servicers and their affiliates also face significant reputational risk with their borrowers, with the court system, and with regulators.

## Impact on the Judicial Process

Weaknesses in foreclosure processes have resulted in increased demands on judicial resources to resolve a variety of foreclosure-related matters, including note ownership. In addition, courts rely extensively on affidavits (usually affidavits of indebtedness) submitted by servicers to decide foreclosure actions on a summary basis without requiring in-person testimony.[9] If such affidavits were not properly prepared or executed, courts may lose confidence in the reliability of the affidavits as persuasive evidence filed on behalf of servicers.[10]

## Impact on the Mortgage Market and Communities

Weaknesses in foreclosure processes led several servicers to slow, halt, or suspend foreclosure proceedings in late 2010, and, in many cases, re-file foreclosure documents. Delays in foreclosure processing, which averaged 450 days in the fourth quarter of 2010, slow the clearing of excess inventory of foreclosed properties and lead to extended periods of depressed home prices.[11] Such delays also impede the efficient disposition of foreclosed homes and the clearing of seriously delinquent mortgages, particularly in geographic regions with greater concentrations of vacant and abandoned properties. This outcome acts as an impediment for communities working to stabilize local neighborhoods and housing markets.[12]

Moreover, local property values may be adversely affected if foreclosed homes remain vacant for extended periods, particularly if such homes are not properly maintained.[13] Widely publicized weaknesses in foreclosure processes also adversely affect home buyer and investor confidence. Assuring robust and credible remedial programs for mortgage servicers so that foreclosure processes can operate and markets can clear without impediments or interventions contributes to attaining a stable national housing market.

---

9  The basic affidavit of indebtedness typically sets forth the name of the party that owns the loan, the default status, and the amounts due for principal, interest, penalties (such as late charges), and fees. This affidavit is frequently the principal basis upon which a court is permitted to order a foreclosure without requiring in-person testimony. Similar documentation may be required in bankruptcy proceedings.

10  Mortgage foreclosures occur under either a judicial or a nonjudicial process. Judicial foreclosures are court-supervised and require the lender to bring a court action to foreclose. Nonjudicial foreclosures (also known as "power of sale") involve little or no court oversight and generally are governed by state statutes. Even foreclosures that are instituted outside the judicial process can be challenged in court, however, and then become subject to court actions.

11  See *Lender Processing Services Applied Analytics* (December 2010, www.lpsvcs.com/RiskMgmt). Current time frames to move a property to foreclosure sale have increased from an average of 250 days in first quarter 2008 to 450 days by fourth quarter 2010.

12  Industry data show approximately four million properties currently listed that have been foreclosed in the past few years. See Mortgage Bankers Association, *National Delinquency Survey*, (November 18, 2010, www.mbaa.org/NewsandMedia/PressCenter/74733.htm).

13  Campbell, John Y., Stefano Giglio and Parag Pathak (July 2010) *Forced Sales and House Prices Manuscript*, Harvard University Department of Economics (kuznets.fas.harvard.edu/~campbell/papers/forcedsales072410.pdf).

# Part 2: Review Findings

The reviews found critical weaknesses in foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party law firms and other vendors. These weaknesses involve unsafe and unsound practices and violations of applicable federal and state laws and requirements, and they have had an adverse effect on the functioning of the mortgage markets. By emphasizing speed and cost efficiency over quality and accuracy, examined servicers fostered an operational environment contrary to safe and sound banking practices.

In connection with the reviews of sampled files and assessments of servicers' custodial activities, examiners found that borrowers whose files were reviewed were seriously delinquent on their mortgage payments at the time of foreclosure and that servicers generally had sufficient documentation available to demonstrate authority to foreclose on those borrowers' mortgages.[14] Nevertheless, examiners noted instances where documentation in the foreclosure file alone may not have been sufficient to prove ownership of the note at the time the foreclosure action commenced without reference to additional information. When additional information was requested and provided to examiners, it generally was sufficient to determine ownership.

In addition, review of the foreclosure files showed that servicers were in contact with the delinquent borrowers and had considered loss-mitigation alternatives, including loan modifications. Examiners also noted a small number of foreclosure sales, however, that should not have proceeded because of an inter-

vening event or condition, such as the borrower: (a) was covered by the Servicemembers Civil Relief Act, (b) filed bankruptcy shortly before the foreclosure action, or (c) was approved for a trial modification.

A summary of the major findings identified during the reviews is set forth below.

## Foreclosure Process Governance

Examiners found governance at each examined servicer in need of substantial improvement, and often cited the absence of sound controls and ineffective management of foreclosure processes. Foreclosure policies and procedures at many of the servicers were either weak or needed substantial expansion to provide effective guidance, control, and ongoing monitoring. As noted above, examiners concluded that the majority of servicers reviewed had inadequate affidavit and notary-signing processes that did not ensure proper attestation (or verification) of the underlying documents.

Examiners found that most servicers had inadequate staffing levels and training programs throughout the foreclosure-processing function and that a large percentage of the staff lacked sufficient training in their positions. The reviews also revealed that all of the servicers relied heavily on outsourcing arrangements with outside counsel and other third-party vendors to carry out foreclosure processes without adequate oversight of those arrangements. Some servicers failed to enter into contracts with the foreclosure law firms performing critical steps in the foreclosure process, including affidavit- and notary-preparation and signing processes. Audit and quality-assurance controls and self-assessment reviews at all of the examined servicers lacked comprehensiveness and failed to identify specific weaknesses and process gaps. Details on these areas of weakness are included below.

---

[14] As previously noted, examiners were limited to the documents in the foreclosure files. Those documents may not have disclosed certain facts that might have led examiners to conclude that a foreclosure should not have proceeded, such as misapplication of payments that could have precipitated a foreclosure action or oral communications between the borrower and servicer staff that were not documented in the foreclosure file.

## Organizational Structure and Availability of Staffing

At the time of the review, a majority of the servicers had inadequate staffing levels or had recently added staff with limited servicing experience. In most instances, servicers maintained insufficient staff to appropriately review documents for accuracy, and provided inadequate training for affidavit signers, notaries, and quality-control staff. Examiners also noted weak controls, undue emphasis on quantitative production and timelines, and inadequate workload monitoring.

## Affidavit and Notarization Practices

Deficiencies in servicers' processes, procedures, controls, and staffing resulted in numerous inaccurate affidavits and other foreclosure-related documents. Examiners found that most servicers had affidavit signing protocols that expedited the processes for signing foreclosure affidavits without ensuring that the individuals who signed the affidavits personally conducted the review or possessed the level of knowledge of the information that they attested to in those affidavits. Examiners confirmed these deficiencies through interviews with individuals who signed documents, as well as through a review of servicers' self-assessments. Examiners also found the majority of the servicers had improper notary practices that failed to conform to state legal requirements. Examiners noted some servicers failed to maintain an accurate list of approved and acceptable notaries that individuals signing documents did not do so in the presence of a notary when required, and that documents often were executed in a manner contrary to the notary's acknowledgement and verification of those documents. In addition, some foreclosure documents indicated they were executed under oath when no oath was administered. Again, examiners confirmed these deficiencies by interviewing notaries and reviewing servicers' self-assessments.

At the examined servicers, anywhere from 100 to more than 25,000 foreclosure actions occurred per month between January 1, 2009, and December 31, 2010, with the quantity depending upon the size of the servicer's operations. It was common to find an insufficient number of staff assigned to review, sign, and notarize affidavits. At some of the servicers, examiners found that insufficient staff—or the lack of specified guidance to staff or external law firms on

affidavit completion—contributed to the preparation and filing of inaccurate affidavits. In the sample of foreclosure files reviewed, examiners compared the accuracy of the amounts listed on affidavits of indebtedness to the documentation in the paper foreclosure file or computerized loan servicing systems. Although borrowers whose foreclosure files were reviewed were seriously in default at the time of the foreclosure action, some servicers failed to accurately complete or validate itemized amounts owed by those borrowers. At those servicers, this failure resulted in differences between the figures in the affidavit and the information in the servicing system or paper file. In nearly half of those instances, the differences—which were typically less than $500—were adverse to the borrower. While the error rates varied among the servicers, the percentage of errors at some servicers raises significant concerns regarding those servicers' internal controls governing foreclosure-related documentation.

## Documentation Practices

During the foreclosure-file reviews, examiners compared the accuracy of amounts listed on the servicers' affidavits of indebtedness with documentation on file or maintained within the electronic servicing system of record. For most of the servicers, examiners cited the lack of a clear auditable trail in reconciling foreclosure filings to source systems of record. In some cases, examiners directed servicers to further audit foreclosure filings to verify the accuracy of information and compliance with legal requirements. Likewise, in connection with the file review, examiners also determined whether critical foreclosure documents were in the foreclosure files, and whether notes appeared properly endorsed and mortgages appeared properly assigned. Examiners noted instances where documentation in the foreclosure file alone may not have been sufficient to prove authority to foreclose without reference to additional information.[15] When more information was requested and provided, it generally was sufficient to determine authority. With some exceptions, examiners found that notes appeared properly endorsed, and mortgages appeared properly assigned.[16] Examiners also trav-

---

[15] Servicers frequently maintained custody of original mortgage documents, although in some cases third-party trustees or custodians held original documents. Custodians are entrusted to manage the original documents that establish note ownership, and, when necessary, produce the original documents for a foreclosure action.

[16] Only in rare instances were custodians unable to produce origi-

eled to servicers' document repository locations to assess custodial activities. Examiners found that servicers generally had possession and control over critical loan documents such as the promissory notes and mortgages. The review did find that, in some cases prior to 2010, the third-party law firms hired by the servicers were nonetheless filing lost-note affidavits or mortgage foreclosure complaints in which they claimed that the mortgage note had either been lost or destroyed, even though proper documentation existed.

## Third-party Vendor Management

The agencies found that the servicers reviewed generally did not properly structure, carefully conduct, or prudently manage their third-party vendor relationships with outside law firms and other third-party foreclosure services providers. Failure to effectively manage third-party vendors resulted in increased reputational, legal, and financial risks to the servicers.

### Arrangements with Outside Law Firms

Servicers typically used third-party law firms to prepare affidavits and other legal documents, to file complaints and other pleadings with courts, and to litigate on their behalf in connection with foreclosure and foreclosure-related bankruptcy proceedings. The servicers reviewed generally showed insufficient guidance, policies, or procedures governing the initial selection, management, or termination of the law firms that handled their foreclosures. Many servicers, rather than conducting their own due diligence, relied on the fact that certain firms had been designated as approved or accepted by investors. Servicers often did not govern their relationships with these law firms by formal contracts. Instead, servicers frequently relied on informal engagements with law firms, at times relying on investors' business relationships with the law firms or the law firms' contractual relationships with default management service providers.

#### Inadequate Oversight

Servicers also did not provide adequate oversight of third-party vendor law firms, including monitoring for compliance with the servicers' standards. Several

servicers exempted third-party law firms from the servicers' vendor management programs or did not identify them as third-party vendors subject to those programs. In some cases, servicers assumed that investors performed such oversight, in which case oversight was limited to ensuring that the law firms were on the investors' lists of approved or accepted providers. Where monitoring of law firms was conducted, it was often limited to things such as responsiveness and timeliness, checking for liability insurance, or determining if any power of attorney given to the firm remained valid rather than assessing the accuracy and adequacy of legal documents or compliance with state law or designated fee schedules.

#### Document Retention Weaknesses

Examiners also found that the servicers did not always retain originals or copies of the documents maintained by the third-party law firms that conducted their foreclosures. Instead, the servicers relied on the firms to maintain those documents. The absence of central and well-organized foreclosure files by the servicers and the consequent need for the examiners to collect foreclosure documentation derived from numerous sources made it difficult at times for examiners to conduct full foreclosure-file reviews while on-site.

#### Inadequate guidance, policies, procedures, and contracts

In addition, examiners generally found an absence of formal guidance, policies, or procedures governing the selection, ongoing management, and termination of law firms used to handle foreclosures. This deficiency resulted in a lack of clarity regarding roles, responsibilities, and performance parameters. Examiners also observed an absence of written contracts between certain servicers and law firms, which left those servicers with no contractual recourse for liability against the firms for performance issues. These deficiencies, coupled with the overall lack of adequate oversight, contributed to instances in which servicers and law firms failed to identify problems with the firms' foreclosure practices, thereby exposing the servicers to a variety of significant risks.

Those problems include instances in which law firms signed documents on behalf of servicers without having the authority to do so, or they changed the format and content of affidavits without the knowledge of the servicers. These defects could, depending upon the circumstances, raise concerns regarding the legality and propriety of the foreclosure even if the ser-

---

nal loan documentation, and in those instances the servicers generally were able to provide adequate explanations, including that copies in the possession of the custodian were acceptable under applicable law.

vicer had sufficient documentation available to demonstrate authority to foreclose.

## Arrangements with Default Management Service Providers (DMSPs)

In connection with the on-site reviews of servicers, the agencies also conducted an on-site review of Lender Processing Services, Inc. (LPS), which provides significant services to support mortgage-servicing and foreclosure processing across the industry. The review of LPS involved a number of issues that are similar to those raised in the reviews of the servicers, and the LPS review covered issues that are unique to the operations, structure and corporate governance of LPS. During the review of LPS, the agencies found deficient practices related primarily to the document execution services that LPS, through its DocX, LLC, and LPS Default Solutions, Inc. subsidiaries had provided to servicers in connection with foreclosures. To address these issues, the agencies are taking formal enforcement action against LPS under section 7(d) of the Bank Service Company Act, 12 USC § 1867(d), and section 8(b) of the Federal Deposit Insurance Act, 12 USC § 1818(b).

### Inadequate Contracts

During the review of servicers, examiners assessed servicers' relationships with third-party vendor DMSPs, focusing primarily on DMSPs that supported the execution of foreclosure-related documents, such as affidavits of indebtedness, lost-note affidavits, and assignments of mortgages.[17] Examiners found that contracts between the servicers and DMSPs generally were inadequate, often omitting significant matters such as service-level agreements. Contracts did not provide for an appropriate level of oversight of third-party vendor law firms in situations where the servicers relied on the DMSPs to conduct such oversight.

### Inadequate Oversight

Examiners also observed that servicers generally demonstrated an overall lack of adequate oversight of DMSPs. At times, the servicers failed to identify DMSPs as vendors subject to the servicers' vendor management programs and demonstrated an inability to provide the examiners with sufficient evidence of due diligence. Examiners found no evidence that servicers conducted audits of the document execution operations of their DMSPs.

---

[17] Not all of the servicers engaged the services of third-party vendor DMSPs to perform document execution services.

The lack of sufficient oversight of DMSPs, coupled with the contractual deficiencies, led to instances in which employees of those DMSPs signed foreclosure affidavits without personally conducting the review or possessing the level of knowledge of information that they attested to in those affidavits. Employees of DMSPs, like the employees of the servicers themselves, executed documents in a manner contrary to the notary's acknowledgement and verification of those documents. In addition, in limited instances, employees of DMSPs signed foreclosure-related documents on behalf of servicers without proper authority. Because some of the servicers relied on DMSPs to oversee their third-party vendor law firms, the contractual deficiencies and lack of oversight of DMSPs contributed to the weaknesses identified above regarding the oversight of third-party vendor law firms.

## Arrangements with Mortgage Electronic Registration Systems, Inc.

In connection with the on-site reviews of servicers, the agencies, together with the Federal Housing Finance Agency (FHFA), also conducted an on-site review of MERSCORP and its wholly owned subsidiary, Mortgage Electronic Registration Systems, Inc. (collectively, MERS), which, as detailed below, provides significant services to support mortgage-servicing and foreclosure processing across the industry. The review of MERS involved a number of issues that are similar to those raised in the reviews of the servicers, and the MERS review covered issues that are unique to the operations, structure and corporate governance of MERS. During the review of MERS, the agencies and FHFA found significant weaknesses in, among other things, oversight, management supervision and corporate governance. To address these issues, the agencies, together with FHFA, are taking formal enforcement action against MERS under section 7(d) of the Bank Service Company Act, 12 USC § 1867(d), and section 8(b) of the Federal Deposit Insurance Act, 12 USC § 1818(b).

MERS streamlines the mortgage recording and assignment process in two ways. First, it operates a centralized computer database or registry of mortgages that tracks the servicing rights and the beneficial ownership of the mortgage note. Each mortgage registered in the database is assigned a Mortgage Identification Number (MIN). Second, MERS can be designated by a member (and its subsequent assignees) to serve in a nominee capacity as the mortgagee of record in public land records. Designating

MERS as the mortgagee is intended to eliminate the need to prepare and record successive assignments of mortgages each time ownership of a mortgage is transferred. Rather, changes in beneficial ownership of the mortgage note (and servicing rights) are tracked in the MERS registry using the MIN.[18] All of the examined servicers had relationships with MERS.

### Inadequate Oversight

Servicers exercised varying levels of oversight of the MERS relationship, but none to a sufficient degree. Several of the servicers did not include MERS in their vendor management programs. In these instances, the servicers failed to conduct appropriate due diligence assessments and failed to monitor, evaluate, and appropriately manage the MERS contractual relationship. Deficiencies included failure to assess the internal control processes at MERS, failure to ensure the accuracy of servicing transfers, and failure to ensure that servicers' records matched MERS' records.

### Inadequate Quality Control

Examiners also determined that servicers' quality-control processes pertaining to MERS were insufficient. In some cases, servicers lacked any quality-assurance processes and relied instead on the infrequent and limited audits that MERS periodically conducted. Other deficiencies included the failure to conduct audit reviews to independently verify the adequacy of and adherence to quality-assurance processes by MERS, and the need for more frequent and complete reconciliation between the servicers' systems and the MERS registry. Several servicers did not include MERS activities in the scope of their audit coverage.

## Ineffective Quality Control (QC) and Audit

Examiners found weaknesses in quality-control procedures at all servicers, which resulted in servicers not

performing one or more of the following functions at a satisfactory level:

- ensuring accurate foreclosure documentation, including documentation pertaining to the fees assessed;

- incorporating mortgage-servicing activities into the servicers' loan-level monitoring, testing, and validation programs;

- evaluating and testing compliance with applicable laws and regulations, court orders, pooling and servicing agreements, and similar contractual arrangements; and

- ensuring proper controls to prevent foreclosures when intervening events or conditions occur that warrant stopping the foreclosure process (e.g., bankruptcy proceedings, applicability of the Servicemembers Civil Relief Act, or adherence to a trial or permanent loan modification program).

Examiners also found weaknesses in internal auditing procedures at all the servicers included in the review. When performed, the few internal audits conducted by servicers failed to identify fundamental control issues that led to the foreclosure process breakdowns. Failures to perform internal audits effectively resulted in servicers' inability to identify, address, and internally communicate foreclosure-processing risks. The failures to identify and communicate these risks resulted in servicers not strengthening the quality of risk-management processes to a level consistent with the nature, increasing size, and complexity of the servicer's foreclosure activities. Moreover, failure to conduct comprehensive audits to identify weaknesses in foreclosure processes resulted in servicers not taking sufficient corrective action to strengthen policy and procedural gaps, increase staffing levels, and improve training in response to sharply rising foreclosure volumes prior to the agencies' foreclosure reviews. The failure to identify the risks associated with foreclosure processing also resulted in servicers not taking action to improve foreclosure documentation-related processes ranging from custody and control of documents to proper notarization processes, or to enhance oversight of third parties managing foreclosure activities on their behalf.

---

[18] While MERS maintains a registry of the beneficial ownership of the mortgage note, this registry is not a system of legal record. The ownership of the note is determined by the Uniform Commercial Code, and, if a change in ownership of a note is not recorded in MERS or is recorded incorrectly, the transfer is still valid.

This page left intentionally blank.

# Part 3: Supervisory Response

At this time, the agencies are taking formal enforcement actions against each of the 14 servicers under the authority of section 8(b) of the Federal Deposit Insurance Act, 12 USC § 1818(b). The deficiencies and weaknesses identified by examiners during their reviews involved unsafe or unsound practices and violations of law, which have had an adverse impact on the functioning of the mortgage markets. Furthermore, the mortgage servicers' deficient foreclosure processes confirmed during the reviews have compromised the public trust and confidence in mortgage servicing and have consequences for the housing market and borrowers. The formal enforcement actions will require servicers, among other things, to:

- **Compliance program:** Establish a compliance program to ensure mortgage-servicing and foreclosure operations, including loss mitigation and loan modification, comply with all applicable legal requirements and supervisory guidance, and assure appropriate policies and procedures, staffing, training, oversight, and quality control of those processes.

- **Foreclosure review:** Retain an independent firm to conduct a review of residential foreclosure actions that were pending at any time from January 1, 2009, through December 31, 2010, to determine any financial injury to borrowers caused by errors, misrepresentations, or other deficiencies identified in the review, and to remediate, as appropriate, those deficiencies.

- **Dedicated resources for communicating with borrowers/single point of contact:** Ensure the following: effective coordination of communication with borrowers related to foreclosure, loss mitigation, and loan modification activities; assurance that communications are timely and appropriate and designed to avoid borrower confusion; continuity in the handling of borrower cases during the loan modification and foreclosure processes; reasonable and good faith efforts, consistent with applicable law and contracts, to engage in loss mitigation and foreclosure prevention for delinquent loans where appropriate; and assurances that decisions concerning loss mitigation or loan modifications will be made and communicated in a timely manner.

- **Third-party management:** Establish policies and procedures for outsourcing foreclosure or related functions to ensure appropriate oversight and that activities comply with all applicable legal requirements, supervisory guidance, and the servicer's policies and procedures, including the appropriate selection and oversight of all third-party service providers, including external legal counsel, DMSPs, and MERS.

- **Management information systems:** Improve management information systems for foreclosure, loss mitigation, and loan modification activities that ensure timely delivery of complete and accurate information to facilitate effective decision making.

- **Risk assessment:** Retain an independent firm to conduct a written, comprehensive assessment of risks in servicing operations, particularly in the areas of foreclosure, loss mitigation, and the administration and disposition of other real estate owned, including but not limited to operational, compliance, transaction, legal, and reputational risks.

In addition to the actions against the servicers, the Federal Reserve and the OTS have issued formal enforcement actions against the parent holding companies to require that they enhance on a consolidated basis their oversight of mortgage-servicing activities, including compliance, risk management, and audit.

The agencies will monitor and assess, on an ongoing basis, the corrective actions taken by the servicers and holding companies that are required by the enforcement actions and take further action, when necessary, to address failures. Enforcement actions and more frequent monitoring will remain in place at each servicer until that servicer has demonstrated that its weaknesses and deficiencies have been cor-

rected, including that adequate policies, procedures, and controls are in place. The agencies will continue to explore ways to improve their supervisory frameworks to identify more promptly and effectively the potential risks in mortgage-servicing and other banking operations.

# Part 4: Industry Reforms

Financial regulatory agencies are developing standards within their authority to improve the transparency, oversight, and regulation of mortgage-servicing and foreclosure processing and to set additional thresholds for responsible management and operation of mortgage-servicing activities. Moreover, a uniform set of national mortgage-servicing and foreclosure-processing standards would help promote accountability and appropriateness in dealing with consumers and strengthen the housing finance market.

Industry reforms that could improve the oversight and regulation of mortgage-servicing and foreclosure processing should generally include standards that require servicers to address major areas of weaknesses highlighted in the review, including in the following general areas:

## Governance and Oversight

- implement and routinely audit sound enterprise-wide policies and procedures to govern and control mortgage-servicing and foreclosure processes

- develop quality controls for effective management of third-party vendors who support mortgage-servicing and foreclosure processing

- strengthen the governance standards intended to ensure compliance with applicable federal and state laws and company policies and procedures

- develop company standards that emphasize accuracy and quality in the processing and validation

of foreclosure and other servicing-related documents throughout the entire foreclosure process

## Organizational Structure, Staffing, and Technology

- increase staffing to adequate levels and provide them with requisite training to effectively manage the volume of default loans and foreclosures

- upgrade information systems and practices to better store, track, and retrieve mortgage-related documents

## Accountability and Responsiveness Dealing with Consumers

- ensure borrowers are offered appropriate loss-mitigation options

- ensure proper custody and control of borrower documents related to the servicing of the mortgage

- increase coordination between loss mitigation and foreclosure-processing units to prevent inappropriate foreclosures

- improve communication with borrowers and establish measurable goals and incentives for delivering accurate information and responsive assistance

- develop complaint-resolution processes that are routinely monitored and measured for quality assurance